329 A.2d 812
COMMONWEALTH of Pennsylvania, By J. Shane
CREAMER, Attorney General, Appellant,

v.

MONUMENTAL PROPERTIES, INC., et al.

Supreme Court of Pennsylvania.
Argued May 22, 1974.
Decided Dec. 5, 1974.

452

Lawrence Silver and Allen C. Warshaw, Deputy Attys. Gen., for appellant.

Lee C. Swartz, Hepford, Zimmerman & Swartz, Patricia F. Kemp, Harrisburg, Milton S. Lazaroff, Samuel Lander, Philadelphia, Joseph A. Klein, Harrisburg, Joseph A. Damico, Jr., Fronefield, duFuria & Petrikin, Media, Thomas M. Kittredge, Philadelphia, Myron B. Markel, Pittsburgh, John P. McKelligott, Obermayer, Rebmann, Maxwell & Hippel, Sigmund H. Steinberg, Philadelphia, Patrick M. O'Donnell, Pittsburgh, Samuel P. Kamin, Pittsburgh, John Havas, Harrisburg, Leonard M. Mendelson, Hollinshead & Mendelson, Pittsburgh, for appellees.

Calvin J. Collier, Gen. Counsel, Lee H. Simowitz, Washington, D. C., for Federal Trade Commission as amicus curiae.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

This appeal presents questions of statutory interpretation concerning the applicability of the Unfair Trade Practices and Consumer Protection Law, Act of December 17, 1968, P.L. 1224, §§ 1–9, 73 P.S. §§ 201–1 to 201–9 (1971).

The Commonwealth, pursuant to the Consumer Protection Law, initiated an original action in the Commonwealth Court against twenty-five landlords who use printed form leases allegedly in violation of the Law, and four companies which print and sell these form leases. Three violations of the Consumer Protection Law are asserted. First, because the leases employ, according to the complaint, "archaic and technical language beyond the easy comprehension of the consumer of average intel-

ligence," it is maintained that the use of such leases constitutes an unfair or deceptive act or practice. The complaint next alleges that the inclusion of certain provisions in the printed form leases is unfair and deceptive. The provisions, the use of which is challenged by the Commonwealth, are "(a) lessor's 'right' to distrain for rent, (b) lessee's unconditional warrant of attorney, (c) lessor's unconditional 'right' to confess judgment, (d) lessee's unconditional waiver of unexplained rights including statutory rights,' (e) lessor's unlimited discretion to accellerate [sic] lessee's rent, (f) lessee's waiver of claim for lessor's negligence, for himself and for third parties, (g) lessor affidavit of default is conclusive evidence of default, (h) lessee's waiver to oppose 'amicable' action in ejectment, (i) lessee's waiver of demand, notice, right of appeal, to a stay and standing to open or strike judgments." Finally, the failure to include in the form leases notice to the tenant of his statutory rights [1]—some of which are nonwaivable [2]—is, according to the Commonwealth, misleading and confusing.

Preliminary objections were filed by sixteen defendants, answers by five, and no responsive pleading by two. The preliminary objections raised the lack of jurisdiction under the Consumer Protection Law, failure to state a cause of action, the existence of an adequate remedy at law, and certain procedural challenges. The Commonwealth Court found it convenient, useful, and desirable to treat the pleadings as if there were a single preliminary objection. *Commonwealth v. Monumental Properties, Inc.*, 10 Pa.Cmwlth. 596, 602, 314 A.2d 333, 335 (1973).

1. The Commonwealth's complaint explicitly refers to The Landlord and Tenant Act of 1951, Act of April 6, 1951, P.L. 69, §§ 101–602, as amended, 68 P.S. §§ 250.101 to 250.602 (1965 & Supp. 1974).

2. E. g., 68 P.S. § 250.512 (Supp.1974). The Legislature specifically provided in § 250.512 (titled "Recovery of improperly held escrow funds") that "[a]ny attempted waiver of this section by a tenant by contract or otherwise shall be void and unenforceable." Id. § 250.512(d) (Supp.1974).

Without ruling on any of the procedural objections of appellees,[3] the Commonwealth Court held that the leasing of housing did not fall within the purview of the Consumer Protection Law. It then proceeded, apparently on the assumption that leasing is covered by the Law, to consider whether the Commonwealth otherwise stated a cause of action; it held that the Commonwealth had not. Next, the court concluded that the printing of form leases by the four "form sellers" could be a violation of the Consumer Protection Law, but that in the instant case there were "not sufficient allegations of clear violation to support the complaint and that it [with respect to the form sellers], therefore, must be dismissed." 10 Pa.Cmwlth. at 617, 314 A.2d at 343. Continuing, the Commonwealth Court stated that it was not empowered to grant the relief requested by the Commonwealth. It then sustained the preliminary objections and dismissed

---

3. The Commonwealth Court also did not rule on whether the Commonwealth had an adequate remedy at law.

Although passing mention is made in that court's written opinion of the procedure used by the Commonwealth, 10 Pa.Cmwlth. at 600–603, 616–617, 314 A.2d 334–336, 342 (passim), the court never ruled on any of the procedural questions raised, id., but rather explicitly based its order on its "holding that the complaint fails to state a cause of action." Id. at 617, 314 A.2d at 342. That this was the sole basis of that court's order cannot be denied. Id. at 618–619, 314 A.2d at 343.

The Commonwealth Court did state in dictum that "the approach utilized by the Attorney General is improper," id. at 604, 314 A.2d at 336, but this comment referred to the Commonwealth's request for relief. Although every request for relief in the Commonwealth's complaint (except for the paragraph asking for "such other relief as this Court deems necessary or proper or just") is written in terms of the "defendants'" conduct, the Commonwealth Court viewed the prayer as too broad on the theory that the Commonwealth was seeking to bind nonparties. Id.

We cannot agree with the hearing court's observation that section 6 of the Consumer Protection Law "provides an exclusive and effective means for the Attorney General to investigate, obtain information and discover facts prior to the bringing of a lawsuit under the [Consumer Protection Law] . . .." Id. at 601, 314 A.2d at 335. See 73 P.S. § 201–6 (1971). The language of section 6 is plainly directory, not mandatory. It was not meant to totally displace other discovery permitted by our Rules of Civil Procedure.

the Commonwealth's complaint with respect to all defendants.

The Commonwealth appealed.[4] For reasons which follow, we affirm in part and vacate and remand in part.

I

The dominating question is whether the Consumer Protection Law covers allegedly unfair or deceptive practices in connection with the leasing of housing. We hold it does. Our review must begin at the beginning, with the language of the statute.

Section 3 states the legislative direction in clear and expansive language.

"Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

Despite this embracive mandate, appellees contend that their use of printed form leases is not covered by the Consumer Protection Law. The argument advanced, and accepted by the Commonwealth Court, is that the business of leasing housing is excluded from the Law's scope because it is not "the conduct of any trade or commerce." We cannot agree.

A

The Legislature sought by the Consumer Protection Law to benefit the public at large by eradicating, among other things, "unfair or deceptive" business practices.[5] Just as earlier legislation was designed to

4. Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 203, 17 P.S. § 211.203 (Supp.1974). Section 203 provides in pertinent part:
 "The Supreme Court shall have exclusive jurisdiction of appeals from all final orders of the Commonwealth Court entered in any matter which was originally commenced in said court and which does not constitute an appeal from another court, an administrative agency or a justice of the peace."

5. There is no indication of an intent to exclude a class or classes of transactions from the ambit of the Consumer Protection Law.

equalize the position of employer and employee [6] and the position of insurer and insured,[7] this Law attempts to place on more equal terms seller and consumer. These remedial statutes are all predicated on a legislative recognition of the unequal bargaining power of opposing forces in the marketplace.[8] Instantly, the Legislature strove, by making certain modest adjustments, to ensure the fairness of market transactions. No sweeping changes in legal relationships were occasioned by the Consumer Protection Law, since prevention of deception and the exploitation of unfair advantage has always been an object of remedial legislation.[9]

> When the Legislature deemed it necessary to make an exception from the Law's scope, it did so in clear language. A single, general exception was made for printers and others similarly situated who act "in good faith and without knowledge of the falsity or deceptive character" of what they print. 73 P.S. § 201–3 (1971). See generally 2A J. Sutherland, Statutes and Statutory Construction § 47.11 (C. Sands ed. 1973).

6. E. g., Labor Management Relations Act, 29 U.S.C.A. § 141 et seq. (1973) (Taft-Hartley Act); National Labor Relations Act, 29 U.S.C.A. § 151 et seq. (1973); 29 U.S.C.A. §§ 101–115 (1973) (Norris-LaGuardia Act); Pennsylvania Labor Relations Act, Act of June 1, 1937, P.L. 1168, §§ 1–14, as amended, 43 P.S. §§ 211.1 to 211.13 (1964 & Supp.1974); Labor Anti-Injunction Act, Act of June 2, 1937, P.L. 1198, §§ 1–18, as amended, 43 P.S. §§ 206a to 206r (1964); Act of August 27, 1963, P.L. 1257, § 21, 71 P.S. § 741.807 (Supp.1974), amending Act of August 5, 1941, P.L. 752, art. VIII, § 807 (Civil Service Act); Public Employe Relations Act, Act of July 23, 1970, P.L. 563, No. 195, §§ 101–2201, 43 P.S. §§ 1101.101 to 1101.2201 (Supp.1974).

7. See The Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, §§ 1–1101, as amended, 40 P.S. §§ 341–991 (1971). See especially 40 P.S. §§ 510–511, 636 (1971); *Ice City, Inc. v. Insurance Co. of North America,* 456 Pa. 210, 217, 314 A.2d 236, 241–242 (1974) (40 P.S. § 636); cf. *Weinberg v. State Workmen's Ins. Fund,* 368 Pa. 76, 82, 81 A.2d 906, 909 (1951). See generally 3 J. Sutherland, Statutes and Statutory Construction § 70.05 (C. Sands ed. 1974).

8. E. g., *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); *American Steel Foundries v. Tri-City Central Trades Council,* 257 U.S. 184, 209, 42 S.Ct. 72, 78, 66 L.Ed. 189 (1921); see *Shafer Petition,* 347 Pa. 130, 31 A.2d 537 (1943).

9. The classic examples are the statute of frauds, Act of March 21, 1772, 1 Sm.L. 389, § 1, 33 P.S. § 1 (1967); the statute of limitations, e. g., Act of March 27, 1713, 1 Sm.L. 76, § 1, 12 P.S. § 31

■ Although the Consumer Protection Law did articulate the evils desired to be remedied, the statute's underlying foundation is fraud prevention. This Court emphatically stated in *Verona v. Schenley Farms Co.*, 312 Pa. 57, 64, 167 A. 317, 320 (1933), "[a]s a statute for the prevention of fraud, it must be liberally construed to effect the purpose. . . ." Accord, *Commercial Banking Corp. v. Freeman*, 353 Pa. 563, 567, 46 A.2d 233, 235 (1946); *Alford v. Raschiatore*, 163 Pa.Super. 635, 63 A.2d 366 (1949); *Nolan v. Jones*, 67 Pa.Super. 430 (1917), aff'd, 263 Pa. 124, 106 A. 235 (1919); *Rudy v. Friedman*, 54 Pa.D. & C.2d 628 (C.P. Delaware County 1971).[10] See generally 3 J. Sutherland, Statutes and

(1953); Act of June 24, 1895, P.L. 236, § 2, 12 P.S. § 34 (1953); the statute of wills, see 20 Pa. S. § 2502 (Special Pamphlet, 1974); and the Statute of 13 Elizabeth designed to end fraudulent conveyances, 13 Eliz., c. 5, §§ 1–3, 39 P.S. App. at 309 (1954).

Modern instances of legislative attempts to remedy fraudulent dealings include the Securities Act of 1933, 15 U.S.C.A. §§ 77a et seq. (1971); Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78a et seq. (1971); Uniform Fraudulent Conveyance Act, Act of May 21, 1921, P.L. 1045, §§ 1–13, 39 P.S. §§ 351–363 (1954); Pennsylvania Securities Act of 1972, Act of December 5, 1972, P.L. 1280, No. 284, §§ 101–704, 70 P.S. §§ 1–101 to 1–704 (Supp.1974).

10. Federal cases are in accord. E. g., *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 n. 7, 92 S.Ct. 165, 168 n. 7, 30 L.Ed.2d 128 (1971); *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *A. T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir. 1967). Indeed, as Justice Story wrote in 1844 for the Supreme Court of the United States:

"In one sense, every law imposing a penalty or a forfeiture may be deemed a penal law; in another sense, such laws are deemed, and truly deserve to be called, remedial. The judge was therefore strictly accurate, when he stated that 'it must not be understood that every law which imposes a penalty is, therefore, legally speaking, a penal law, that is, a law which is to be construed with great strictness in favor of the defendant. Laws enacted for the prevention of fraud, for the suppression of a public wrong, or to effect a public good, are not in the strict sense, penal acts, although they may inflict a penalty for violating them.' "

*Taylor v. United States*, 44 U.S. (3 How.) 197, 210, 11 L.Ed. 559 (1844). See also *United States v. Stowell*, 133 U.S. 1, 12, 10 S.Ct. 244, 245–246, 33 L.Ed. 555 (1890); *Pennsylvania R.R. v. Ewing*, 241 Pa. 581, 587, 88 A. 775, 777 (1913).

Statutory Construction § 70.01 (C. Sands ed. 1974) ; 1 W. Blackstone, Commentaries * 88–89.

Since the Consumer Protection Law was in relevant part designed to thwart fraud in the statutory sense, it is to be construed liberally to effect its object of preventing unfair or deceptive practices.

## B

Necessarily, we reject the Commonwealth Court's conclusion that the Consumer Protection Law must be strictly construed. The Commonwealth Court held that the statute was penal in nature and therefore required a strict construction. This characterization ignores settled case law, e. g., *Commercial Banking Corp. v. Freeman,* supra; *Verona v. Schenley Farms Co.,* supra; *Commonwealth v. Shaleen,* 215 Pa. 595, 64 A. 797 (1906), and the clear language of the Statutory Construction Act, 1 Pa.S. § 1928 (Special Pamphlet, 1973).

To reach its result the hearing court focused on section 8 of the Consumer Protection Law. That section limits to $5000 the amount of fine payable upon violation of an injunction issued under section 4.

"[B]ecause the Act in question permits the Commonwealth to petition for civil penalties up to $5,000 (if an injunction is issued by this Court as a result of the present action) . . . the Act contains a penal provision, and therefore must be strictly construed." *Commonwealth v. Monumental Properties, Inc.,* 10 Pa. Cmwlth, 596, 607, 314 A.2d 333, 337–338 (1974).

█ We, however, need not address the question whether section 8 is truly a penal provision,[11] for even assuming arguendo that it is, the Commonwealth Court's conclusion cannot stand. The logical flaw in the reasoning of the hearing court is that, if a statute "contains" a penal provision, the entire statute must be strictly con-

11. See *People ex rel. Dunbar v. Gym of America, Inc.,* 177 Colo. 97, 105, 493 P.2d 660, 664 (1972); 1 W. Blackstone, Commentaries * 88.

strued. This notion is strikingly at odds with 1 Pa. S. § 1928 (Special Pamphlet, 1973). Section 1928 directs that although penal provisions are to be strictly construed, all others "shall be liberally construed to effect their objects and to promote justice." Id. § 1928(c). The legislative emphasis is on provisions, not statutes in their entirety. Our cases are in accord. See *Commercial Banking Corp. v. Freeman*, 353 Pa. at 567, 46 A.2d at 235–236; *Verona v. Schenley Farms Co.*, 312 Pa. at 65, 167 A. at 320; *Commonwealth v. Shaleen*, 215 Pa. at 597, 64 A. at 798; *Koch's Estate*, 5 Rawle 338, 340 (Pa. 1835); *Commonwealth v. Yaste*, 166 Pa.Super., 275, 70 A.2d 685 (1950); *Commonwealth v. Hagy*, 58 Lancaster L.Rev. 47, 49 (Pa.Q.S.Lancaster County 1962).

Here, we are concerned with the effect of provisions which are in no sense penal. Section 3 in sweeping language declares the concerns of the Legislature, and section 2 further and more fully defines those concerns. These expansive provisions reflect the legislative judgment that unfairness and deception in all consumer transactions must be halted. These sections of the Consumer Protection Law, in accordance with the legislative intent, are to be liberally construed to effectuate that intent.

## C

█ The Commonwealth Court was also persuaded by its conclusion that there exists no precedent under the federal models of the Consumer Protection Law to support a holding that the Law covers the leasing of apartment housing. The Consumer Protection Law has regularly been interpreted by the Commonwealth Court as being based on the Federal Trade Commission Act [12] and the Lanham Trademark Act.[13] *Commonwealth v. Monu-*

12. 15 U.S.C.A. §§ 41–58 (1973).

13. 15 U.S.C.A. §§ 1051–1127 (1963).

*mental Properties, Inc.,* 10 Pa.Cmwlth. 596, 608, 314 A. 2d 333, 338 (1974) ; *Commonwealth v. Hush-Tone Industries, Inc.,* 4 Pa.Cmwlth. 1, 20–21 (1971). Accord, *Commonwealth v. Foster,* 57 Pa.D. & C.2d 203, (C.J. Allegheny County 1972) ; cf. *Commonwealth v. Pennsylvania APSCO System, Inc.,* 10 Pa.Cmwlth. 138, 140, 309 A.2d 184, 185 (1973). Indeed, in all relevant respects the language of section 3 of the Consumer Protection Law and section 5 of the FTC Act[14] is identical.[15] The Lanham Act's similarity to the Consumer Protection Law is likewise strong.[16] We thus agree with the Commonwealth Court that " 'we may look to the decisions under those Acts for guidance and interpretation.' " *Commonwealth v. Monumental Properties, Inc.,* 10 Pa.Cmwlth. at 608, 314 A.2d at 338 (quoting *Commonwealth v. Hush-Tone Industries, Inc.,* 4 Pa.Cmwlth. at 21).

The Commonwealth Court in large part based its result that the leasing of residential apartments is not covered by the Consumer Protection Law on this proposition.

"We have studied both of these Federal statutes and find no mention of the rental of real property. Furthermore, we have found no case wherein the leasing of property has been brought within the purview of those Federal statutes."

14. Section 5 of the FTC Act provides in pertinent part:
"Unfair methods of competition in commerce, and unfair or deceptive acts or practice in commerce, are declared unlawful." 15 U.S.C.A. § 45(a)(1) (1973). Pennsylvania's Consumer Protection Law relevantly states:
"Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."
73 P.S. § 201–3 (1971).

15. Additionally, several of the appellees concede that the genesis of the Consumer Protection Law lies in the FTC and Lanham Acts.

16. Compare 15 U.S.C.A. § 1114 (1963), with 73 P.S. §§ 201–2, 201–3 (1971).

10 Pa.Cmwlth. at 608–609, 314 A.2d at 338. It is enough to show that this reasoning does not withstand analysis with respect to one of these federal statutes—the FTC Act.

The Federal Trade Commission, in an amicus curiae brief filed in this case, correctly points out that section 5 of the FTC Act, in its application to both antitrust enforcement and consumer protection, has been given a broad and flexible interpretation. This was certainly the intent of Congress. The House Conference Report that accompanied the original passage of the FTC Act states:

> "It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task."

H.R.Conf.Rep.No.1142, 63d Cong., 2d Sess. 19 (1914). See also S.Rep.No.597, 63d Cong., 2d Sess. 13 (1914). The United States Supreme Court has consistently followed the congressional mandate that section 5 be applied broadly to whatever business conduct injured either competitor or consumer. E. g., *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972); *FTC v. Brown Shoe Co.*, 384 U.S. 316, 320–321, 86 S.Ct. 1501, 1504, 16 L.Ed.2d 587 (1966); *FTC v. Motion Picture Advertising Service Co.*, 344 U.S. 392, 394, 73 S.Ct. 361, 363, 97 L.Ed. 426 (1953); *FTC v. Cement Institute*, 333 U.S. 683, 693, 68 S.Ct. 793, 799–800, 92 L. Ed. 1010 (1948); *FTC v. R. F. Keppel & Brothers, Inc.*, 291 U.S. 304, 310, 54 S.Ct. 423, 425, 78 L.Ed. 814 (1934).

In *FTC v. Sperry & Hutchinson Co.*, the Supreme Court was recently pressed to decide, inter alia, whether section 5 of the FTC Act empowered "the Commission to proscribe practices as unfair or deceptive in their effect upon consumers regardless of their nature or quality as

competitive practices or their effect upon competition?"
405 U.S. at 239, 92 S.Ct. at 903. After a detailed review
of legislative history and earlier decisions, that Court
squarely held:

> "Thus, legislative and judicial authorities alike con-
> vince us that the Federal Trade Commission does not
> arrogate excessive power to itself if, in measuring a
> practice against the elusive, but congressionally man-
> dated standard of fairness, it, like a court of equity,
> considers public values beyond simply those enshrined
> in the letter or encompassed in the spirit of the anti-
> trust laws."

Id. at 244, 92 S.Ct. at 905 (footnote omitted). That sec-
tion 5 of the FTC Act was meant as an adaptable tool for
protection of the public interest cannot be denied.

Despite the remedial nature of and expansive interpre-
tation given to section 5, the Commonwealth Court im-
plied an exception from the coverage of section 5 because
it could find "no mention of the rental of real property."
This conclusion led the Commonwealth Court ineluctably
to its holding that the Consumer Protection Law did not
cover leasing.

We have seen, however, that Congress chose not to de-
lineate precisely the type of unfair and deceptive prac-
tices outlawed; rather, it gave the Commission a deliber-
ately flexible standard. *FTC v. Sperry & Hutchinson
Co.*, 405 U.S. at 239–240, 92 S.Ct. at 903. It is altogeth-
er inconsistent with the congressional intent that section
5 be a broad, all-inclusive trade regulation statute, to im-
ply an exception for leases. Moreover, the argument
that no specific mention is made of leasing really cuts
the other way, in view of Congress' explicitness when it
desired to make an exception from the jurisdiction of
section 5. See 15 U.S.C.A. § 45(a)(6) (1963).[17]

---

**17.** Congress, in 15 U.S.C.A. § 45(a)(6) (1963), placed banks, com-
mon carriers, air carriers, foreign air carriers, and certain other
corporations beyond the regulatory power of the Federal Trade
Commission.

Also, there are numerous cases under section 5 in which the Commission sought to enjoin unfair and deceptive methods in connection with the leasing of property. E. g., *Atlantic Refining Co. v. FTC*, 381 U.S. 357, 363 n. 5, 85 S.Ct. 1498, 1503 n.5, 14 L.Ed.2d 443 (1965) ; *FTC v. Paramount Famous-Lasky Corp.*, 57 F.2d 152 (2d Cir. 1932) ; *Sinclair Refining Co. v. FTC*, 276 F. 686 (7th Cir. 1921); *Canfield Oil Co. v. FTC*, 274 F. 571 (6th Cir. 1921) ; *Standard Oil Co. of New York v. FTC*, 273 F. 478 (2d Cir. 1921). Aside from judicial decisions, administrative proceedings initiated by the Commission have resulted in section 5 jurisdiction over leases. E. g., *Grand Caillou Packing Co.*, 65 F.T.C. 799 (1964), aff'd in part and rev'd in part sub. nom. *LaPeyre v. FTC*, 366 F.2d 117 (5th Cir. 1966) ; *Pure Carbonic, Inc.*, 44 F.T.C. 1029 (1948); *Linen Supply Board of Trade of New Jersey*, 36 F.T.C. 382 (1943) ; *Kaumagraph Co.*, 20 F.T.C. 1 (1934). Recently, the Commission has accepted consent orders against the operator and several large merchant-tenants of a shopping center who had entered into leases giving the merchants power to control the stores which could rent space in the center. *Gimbel Brothers, Inc.*, F.T.C. Dkt. No. 8885 (filed May 8, 1972).[18] And it has proceeded against deception and unfairness in the sale of land. *GAC Corp.*, F.T.C. File No. 722, 3187, F.T.C. Press Release (Mar. 26, 1974). Action has also been taken to enjoin the advertising of rental housing subject to a policy of racial discrimination. First Buckingham Community, Inc., 73 F.T.C. 938 (1968).

No support in the federal precursors of the Consumer Protection Law can be found for an exclusion for leasing from the Law's broad prohibition of unfair and deceptive practices in market transactions. On the other hand, the legislative history of, decisions interpreting, and FTC proceedings under section 5 of the FTC Act strongly

---

18. See generally Note, The Antitrust Implications of Restrictive Covenants in Shopping Center Leases, 86 Harv.L.Rev. 1201 (1973).

counsel that the leasing of housing is covered by the Consumer Protection Law.

### D

Appellees apparently recognize that the flexible and all-inclusive language of section 3 of the Consumer Protection Law does not favor their constrictive interpretation. They then base their argument on a much narrower question of legislative intent: whether leasing is included in the statutory definition of "trade or commerce." The Consumer Protection Law states that those words

"mean the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth."

73 P.S. § 201–2(3) (1971).

The initial lesson revealed by this definition is contained in the command that trade and commerce "includes any trade or commerce directly or indirectly affecting the people of this Commonwealth." The legislative intent gleaned from these words is again certain—the statute is to be liberally construed.

The statutory definition of trade or commerce also refines the issue. Our only task is to see whether the Consumer Protection Law covers leasing. If leasing is covered, the Law in plain terms applies to the leasing of "property, tangible or intangible, real, personal, or mixed." This comprehensive definition clearly includes residential property.

■ Appellees strenuously argue that the leasing of residences does not meet the statutory test of "sale or distribution of . . . any property." This argument prevailed in the Commonwealth Court because that court believed "it is significant that the Legislature, having in-

dicated its complete understanding of the word 'lease', omitted that term from any provision in the Act before us." 10 Pa.Cmwlth. at 608, 314 A.2d at 338. The absence of a word in a statute, however, does not properly end the inquiry but rather serves as the starting point of analysis. The words of the statute not being free of all ambiguity, we must ascertain the Legislature's intent by considering other indicia of that intent. See 1 Pa. S. § 1921(b) (Special Pamphlet, 1973).

■■ We hold that the leasing of residences falls within the ambit of the Consumer Protection Law. Our holding has its seat in several sources: the contemporary view, expressed in numerous decisions, of residential leases; traditional common-law conceptions of the lease; the modern, pragmatic and functional approach of the Legislature when attempting to solve societal problems; and the consequences of a holding to the contrary.

i

As adumbrated earlier, the Consumer Protection Law was designed to equalize the market position and strength of the consumer vis-a-vis the seller. A perception of unfairness led the Legislature to regulate more closely market transactions. The mischief to be remedied was the use of unfair or deceptive acts and practices by sellers. As part of the Law's object, fraudulent conduct that would mislead or confuse a consumer was banned.

Functionally viewed, the modern apartment dweller is a consumer of housing services. The contemporary leasing of residences envisions one person (landlord) exchanging for periodic payments of money (rent) a bundle of goods and services, rights and obligations. The now-classic description of this economic reality appears in *Javins v. First National Realty Corp.*, 138 U.S.App.D. C. 369, 428 F.2d 1071, 1074, cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970) (footnote omitted).

"When American city dwellers, both rich and poor, seek 'shelter' today, they seek a well known package of goods and services—a package which includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance."

Accord, *Steele v. Latimer*, 214 Kan. 329, 334, 521 P.2d 304, 309–310 (1974); *King v. Moorehead*, 495 S.W.2d 65, 70 (Mo.App.1973); *Foisy v. Wyman*, 83 Wash.2d 22, 27, 515 P.2d 160, 164 (1973); cf. *Kline v. Burns*, 111 N.H. 87, 91, 276 A.2d 248, 251 (1971). See generally Friedman on Leases § 1.1, at 5 (1974).

The purchaser of this bundle (tenant) is as much a consumer as is the purchaser of an automobile, household appliance, or any other consumer good.[19] This much was unanimously recognized by the Supreme Court of California.

"In most significant respects, the modern urban tenant is in the same position as any other normal consumer of goods. . . . Through a residential lease, a tenant seeks to purchase 'housing' from his landlord for a specified period of time [and] [t]he landlord 'sells' housing . . .."

*Green v. Superior Court*, 10 Cal.3d 616, 627, 111 Cal. Rptr. 704, 711, 517 P.2d 1168, 1175 (1974) (citation omitted); accord, *Mease v. Fox*, Iowa, 200 N.W.2d 791, 793 (1972). See generally Schoshinski, Remedies of the Indigent Tenant: Proposal for Change, 54 Geo.L.J. 519 (1966); Note, The Tenant as a Consumer, 3 U.C.Davis L.Rev. 59 (1971). And from the landlord's vantage, the marketing and distribution of the bundle increasingly

19. Cf. *Smith v. Old Warson Dev. Co.*, 479 S.W.2d 795 (Mo.1972). " 'Common sense tells us that a purchaser [of a new home] under these circumstances should have at least as much protection as the purchaser of a new car, or a gas stove, or a sump pump, or a ladder.' " Id. at 799 (footnote omitted).

follows methods mapped out by purveyors of modern consumer goods. Cf. *Smith v. Old Warson Development Co.*, 479 S.W.2d 795 (Mo.1972); *Schipper v. Levitt & Sons, Inc.*, 44 N.J. 70, 90, 207 A.2d 314, 325 (1965).[20]

We agree with the Supreme Court of New Jersey in *Schipper*, that

"[i]n the developing steps toward higher consumer and user protection through higher trade morality and responsibility, the law should view trade relations realistically rather than mythically."

44 N.J. at 99, 207 A.2d at 330 (1965). Accord, *Mease v. Fox*, Iowa, 200 N.W.2d 791, 794 (1972); *Steele v. Latimer*, 214 Kan. 329, 333, 521 P.2d 304, 308 (1974); 6 S. Williston, A Treatise on the Law of Contracts § 890A (3d ed. 1962). These words ring particularly true in the context of construing remedial legislation designed to correct imbalances in the marketplace. See, e. g., *FTC v. Sperry & Hutchinson Co.*, supra; *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195, 84 S.Ct. 275, 284–285, 11 L.Ed.2d 237 (1963) (Investment Advisers Act of 1940, 15 U.S.C.A. §§ 80b–1 to 80b–21 (1971), to be liberally construed); *Goodman v. FTC*, 244 F.2d 584, 590–591 (9th Cir. 1957) (§ 5 of FTC Act).

We cannot presume that the Legislature when attempting to control unfair and deceptive practices in the conduct of trade or commerce intended to be strictly bound

**20.** Speaking in the context of the sale of houses, the New Jersey Supreme Court perceptively noted:
"We consider that there are no meaningful distinctions between Levitt's mass production and sale of homes and the mass production and sale of automobiles . . . ."
*Schipper v. Levitt Sons, Inc.*, 44 N.J. 70, 90, 207 A.2d 314, 325 (1965). In *Schipper*, the New Jersey Supreme Court unanimously applied the warranty or strict liability principle first enunciated in *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960), to the seller of residential housing. For additional recognition that housing is being marketed similarly to other consumer products, see *GAC Corp.*, F.T.C. File No. 722, 3187, F.T.C. Press Release (Mar. 26, 1974). See generally Roberts, The Demise of Property Law, 57 Cornell L.Rev. 1, 3 (1971).

by common-law formalisms. Rather the more natural inference is that the Legislature intended the Consumer Protection Law to be given a pragmatic reading—a reading consistent with modern day economic reality. That pragmatic reading dictates that purchasers of rental housing be treated as consumers and, therefore, within the class of persons sought to be protected by the Consumer Protection Law.

ii

Moreover, there is substantial common-law authority that the leasing of property is identical to the sale of the premises. Dean Prosser accurately states the general rule:

"When land is leased to a tenant, the law of property regards the lease as equivalent to a sale of the premises for the term."

W. Prosser, Handbook of the Law of Torts § 63, at 399 (4th ed. 1971) (footnote omitted). Support for this proposition goes back at least to 1809 when the Supreme Judicial Court of Massachusetts stated that "a lease for years is a sale of the demised premises for the term; and . . . [t]he rent is in effect the price, or purchase money, to be paid for the ownership of the premises during the term . . .." *Fowler v. Bott*, 6 Mass. 63, 67 (1809). And in this Commonwealth, at least one court has come to the identical conclusion.

"A lease is a sale and conveyance of the property leased, which only differs from what is commonly called a deed, in being limited to a term certain, and leaving a reversionary interest in the grantor. . . . From the moment of letting, the land becomes the tenant's, and remains such until the lease terminates; the house, if there be one, is his castle . . .."

*Wien v. Simpson*, 2 Phila. 158, (Pa.Dist.Ct.1858). Accord, *Fetters v. City of Des Moines*, 260 Iowa 490, 495,

149 N.W.2d 815, 819–820 (1967); *Abby v. Billups*, 35 Miss. 618, 630 (1858) ("A lease for years is a bargain and sale of the demised premises."); *Warner v. Fry*, 360 Mo. 496, 228 S.W.2d 729 (1950); *Sylvester Watts Smyth Realty Co. v. American Surety Co.*, 292 Mo. 423, 436, 238 S.W. 494, 498 (1921). *Longi v. Raymond-Commerce Corp.*, 34 N.J.Super. 593, 600, 113 A.2d 69, 72 (App.Div. 1955).

Courts of other jurisdictions have considered leases as the sale of an interest in real estate, e. g., *Brenner v. Spiegle*, 116 Ohio St. 631, 632, 157 N.E. 491, 492–493 (1927), or as the "sale of the possession, occupancy and profits of land for a term." *Thiokol Chemical Corp. v. Morris County Board of Taxation*, 41 N.J. 405, 416, 197 A.2d 176, 182 (1964). Still other courts recognize that the lessee's interest is tantamount to absolute ownership of the premises for the term. E. g., *Baker v. Clifford-Matthew Investment Co.*, 99 Fla. 1229, 1231, 128 So. 827, 829 (1930) (per curiam); *Rogers v. Martin*, 87 Fla. 204, 206, 99 So. 551, 552 (1924); *Pierce v. Pierce*, 351 Ill. App. 336, 341, 115 N.E.2d 107, 110 (1953), aff'd, 4 Ill.2d 497, 123 N.E.2d 511 (1954) (leasehold subject to partition); *People v. Hardt*, 329 Ill.App. 153, 158, 67 N.E.2d 487, 490 (1946); *Martinique Realty Corp. v. Hull*, 64 N. J.Super. 599, 607, 166 A.2d 803, 808 (App.Div.1960); *Longi v. Raymond-Commerce Corp.*, 34 N.J.Super. 593, 600, 113 A.2d 69, 72 (App.Div.1955); *Yrisarri v. Wallis*, 76 N.M. 776, 778, 418 P.2d 852, 854 (1966); *Tri-Bullion Corp. v. American Smelting & Refining Co.*, 58 N.M. 787, 793, 277 P.2d 293, 297 (1954); *Stern v. Sawyer*, 78 Vt. 5, 10, 61 A. 36, 38 (1905); cf. *Application of City of Lincoln*, 174 Neb. 837, 846, 120 N.W.2d 297, 303–304 (1963).

The United States Supreme Court has also sanctioned treating a lessee as the owner of the property leased. In *Offutt Housing Co. v. County of Sarpy*, 351 U.S. 253,

261–262, 76 S.Ct. 814, 819–820, 100 L.Ed. 1151 (1956),[21] that Court held, inter alia, that an agency of the state could constitutionally tax a lessee on the full value of buildings and improvements, despite the lessor's obvious retention of title, where the lease was for 75 years and the estimated useful life of buildings and improvements was 35 years.

It is certainly the modern understanding of the common law of leases that "[a] tenant is a purchaser of an estate in land . . .." *Pines v. Perssion,* 14 Wis.2d 590, 594, 111 N.W.2d 409, 412 (1961). Accord, *Javins v. First National Realty Corp.,* 138 U.S.App.D.C. 369, 428 F.2d 1071, 1079, cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); *Green v. Superior Court,* 10 Cal.3d 616, 111 Cal.Rptr. 704, 517 P.2d 1168 (1974);[22] *Lemle v. Breeden,* 51 Haw. 426, 462 P.2d 470 (1969);[23] *Boston Housing Authority v. Hemingway,* 363 Mass. 184, ——, 293 N.E.2d 831, 841–843 (1973).

These former decisions on the nature of the landlord-tenant relationship, see 1 Pa. S. § 1921(c)(5). (Special Pamphlet, 1973), help guide us to the conclusion that the business of leasing housing services is covered by the Consumer Protection Law.

21. See also *Waskey v. Chambers,* 224 U.S. 564, 565, 32 S.Ct. 597, 598, 56 L.Ed. 885 (1912) ("But it is obvious that in principle the right of a lessee is the same as that of a purchaser in fee . . .."). Cf. *Mesa Verde Co. v. Board of County Comm'rs,* 178 Colo. 49, 495 P.2d 229, appeal dismissed, 409 U.S. 810, 93 S.Ct. 69 (1972).

22. "At common law, the real estate lease developed in the field of real property law, not contract law. Under property law concepts, a lease was considered a conveyance or sale of the premises for a term of years . . .."
*Green v. Superior Court,* 10 Cal.3d 616, 622, 111 Cal.Rptr. 704, 707, 517 P.2d 1168, 1171 (1974).

23. "At common law when land was leased to a tenant, the law of property regarded the lease as equivalent to a sale of the premises for a term."
*Lemle v. Breeden,* 51 Haw. 426, 429, 462 P.2d 470, 472 (1969).

### iii

We are not unmindful that in elegantia juris a sale requires the passing of title. The argument runs from this observation that since a lease transfers only possession, not title, a lease cannot be a sale.

Whatever vitality the concept of title has elsewhere in the law, we think it unimportant in the context of the Consumer Protection Law. Hinging the remedies of the Consumer Protection Law on the passing of title simply fails to reflect fairly both modern economic conditions and, more importantly, the Legislature's intent.

It is plain, too, that section 5 of the FTC Act (see text accompanying notes 12–18 supra), has been applied without regard to the form in which a transaction was couched. Licenses,[24] franchises,[25] and leases [26] have all been subject to section 5 jurisdiction. The company's purported retention of title over trading stamps in *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 238, 92 S.Ct. 898, 902, 31 L.Ed.2d 170 (1972), did not affect the Commission's power to proceed against the alleged violations in that case. A sale, in the traditional sense, is unnecessary to trigger the applicability of the FTC Act.

In this regard, however, the Commonwealth Court was impressed that the Uniform Commercial Code defines sale in terms of "the passing of title." 12A P.S. § 2–106(1) (1970).[27] But it must be recognized that the UCC is not tied to a rigid, formalistic view of title. See generally id. § 2–401 (1970). For instance, a sale within the UCC's meaning will occur even if the seller formally

---

24. E. g., *Columbia Broadcasting Sys., Inc. v. FTC*, 414 F.2d 974 (7th Cir. 1969), cert. denied, 397 U.S. 907, 90 S.Ct. 903, 25 L.Ed. 2d 88 (1970); Doubleday & Co., 50 F.T.C. 263 (1953).

25. E. g., *FTC v. Brown Shoe Co.*, 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966).

26. See text accompanying notes 17–18 supra.

27. Act of April 6, 1953, P.L. 3, § 2–106(1), reenacted October 2, 1959, P.L. 1023, § 2–106(1). Cf. Act of October 27, 1955, P.L. 744, § 4(j), as amended, 43 P.S. § 954(j) (Supp.1974).

retains title. Assuming a functional stance (as we do in-stantly), the UCC treats this retention of title, absent a contrary intent, as the reservation of a security interest. Id. § 2–401(1) (1970). Thus, the UCC's modern state-ment of contract law views the buyer-seller relationship pragmatically and avoids undue adherence to older for-malisms. Indeed, the very purpose of the UCC was to end the nineteenth century's overly formalistic approach to contract law.

More fundamentally, that the Legislature in enacting the UCC found it convenient to adopt a particular defini-tion of sale in order to further its view of commercial reasonableness does not begin to answer the question of legislative intent now before us. To woodenly apply the UCC's definition of sale to the Consumer Protection Law would not only defeat the Law's remedial objects, but, ironically, would be contrary to the spirit of the UCC. We do not say that the common-law distinction between title and possession is for all purposes irrelevant, but only that the definition of trade and commerce in the Consumer Protection Law is not bound by this distinc-tion.

iv

In reaching our result we are especially solicitous of the consequences of a contrary interpretation. See 1 Pa. S. § 1921(c)(6) (Special Pamphlet, 1973). We have seen that the Consumer Protection Law was designed to end unfairness and deception in consumer transactions with the result that consumers would be placed on a more equal footing with sellers. And this Law was meant to apply to "any trade or commerce directly or in-directly affecting the people of this Commonwealth." 73 P.S. § 201–2(3) (Supp.1971).

It would be difficult indeed to imagine anything that affects the lives and welfare of the people of this Com-monwealth more than housing. The Legislature has re-

peatedly declared that this Commonwealth suffers from a housing crisis. In 1937,[28] 1941,[29] 1945,[30] 1947,[31] 1957,[32] 1959,[33] 1965,[34] 1968,[35] and 1972 [36] the Legislature found as a fact that a housing shortage exists. See *Johnson v. Pennsylvania Housing Finance Agency*, 453 Pa. 329, 332–335, 337–338, 309 A.2d 528, 530–531, 532–533 (1973).

This Court has independently acknowledged the existence of a crisis caused by the lack of suitable housing. *Klein v. Allegheny County Health Department*, 441 Pa. 1, 7, 269 A.2d 647, 651 (1970) ; *Reitmeyer v. Sprecher*, 431 Pa. 284, 289–290, 243 A.2d 395, 398 (1968) ; cf. *Galligan v. Arovitch*, 421 Pa. 301, 304, 219 A.2d 463, 465 (1966). The words of Chief Justice, then Justice Jones accurately describe the economic plight of the modern residential tenant.

"We must recognize the fact that, since the time when *Harris* [*v. Lewistown Trust Co.*, 326 Pa. 145, 191 A. 34 (1937)] was decided, critical changes have taken place economically and socially. Aware of such changes, we must realize further that most frequently today the average prospective tenant vis-a-vis the prospective landlord occupies a disadvantageous position. Stark necessity very often forces a tenant into occu-

28. Act of May 18, 1937, P.L. 704, § 2, 15 P.S. § 2802 (1967); Act of May 28, 1937, P.L. 955, § 2, 35 P.S. § 1542 (1964).

29. Act of July 31, 1941, P.L. 644, § 2, 35 P.S. § 1595.2 (1964).

30. Act of May 24, 1945, P.L. 991, § 2, 35 P.S. § 1702 (1964).

31. Act of June 10, 1947, P.L. 486, § 1, 35 P.S. § 1641 (1964); Act of July 7, 1947, P.L. 1414, § 2, 35 P.S. § 1590.2 (1964).

32. Act of May 27, 1957, P.L. 197, § 1, 35 P.S. § 1702 (1964).

33. Act of December 3, 1959, P.L. 1688, Art. I, § 102, 35 P.S. § 1680.102 (1964).

34. Act of December 22, 1965, P.L. 1167, § 1, 35 P.S. § 1542 (1964 & Supp.1974).

35. Act of July 31, 1968, P.L. 914, § 1, 35 P.S. § 1680.102 (1964 & Supp.1974).

36. Act of December 5, 1972, P.L. 1259, No. 282, § 1, 35 P.S. § 1680.102 (1965 & Supp.1974).

pancy of premises far from desirable and in a defective state of repair. The acute housing shortage mandates that the average prospective tenant accede to the demands of the prospective landlord as to conditions of rental, which, under ordinary conditions with housing available, the average tenant would not and should not accept.

"No longer does the average prospective tenant occupy a free bargaining status and no longer do the average landlord-to-be and tenant-to-be negotiate a lease on an 'arm's length' basis. Premises which, under normal circumstances, would be completely unattractive for rental are now, by necessity, at a premium. If our law is to keep in tune with our times we must recognize the present day inferior position of the average tenant vis-a-vis the landlord when it comes to negotiating a lease."

*Reitmeyer v. Sprecher*, 431 Pa. at 289–290, 243 A.2d at 398.

Other jurisdictions have taken judicial notice of the contemporary shortage of residential housing and the unequal bargaining power of landlords and tenants. *E. g., Javins v. First National Realty Corp.*, 138 U.S. App.D.C. 369, 428 F.2d 1071, 1079–1080, cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); *Green v. Superior Court*, 10 Cal.3d 616, 625, 111 Cal. Rptr. 704, 709–710, 517 P.2d 1168, 1173–1174 (1974); *Lemle v. Breeden*, 51 Haw. 426, 428, 462 P.2d 470, 472–473 (1969); *Mease v. Fox*, Iowa, 200 N.W.2d 791, 794–795 (1972); *Steele v. Latimer*, 214 Kan. 329, 331, 521 P.2d 304, 307–309 (1974); *King v. Moorehead*, 495 S.W.2d 65, 71 (Mo.App.1973); *Kline v. Burns*, 111 N.H. 87, 91, 276 A.2d 248, 251 (1971); *Marini v. Ireland*, 56 N.J. 130, 141, 145, 265 A.2d 526, 532–533, 535 (1970); *Reste Realty Corp. v. Cooper*, 53 N.J. 444, 452, 251 A.2d 268, 272 (1968). See also *Tucker v. Crawford*, 315 A.2d 737, 741 (Del.Super.1974); *Jack*

*Springs, Inc. v. Little,* 50 Ill.2d 351, 280 N.E.2d 208 (1972); *Boston Housing Authority v. Hemingway,* 363 Mass. 184, ——, 293 N.E.2d 831, 841–842 (1973); *Foisy v. Wyman,* 83 Wash.2d 22, 26, 515 P.2d 160, 163–165 (1973); *Pines v. Perssion,* 14 Wis.2d 590, 596, 111 N.W. 2d 409, 413 (1961).

The housing crisis has not escaped national attention. Congress in 1949 expressed its concern over the lack of adequate housing,[37] and an inadequate housing supply is still a serious national problem.[38] Cases implying the significance of housing-related disputes and of attempted solutions to landlord-tenant problems have increasingly reached the Supreme Court.[39] And executive studies have nearly unanimously found that better housing is critical to the improvement of the urban social environment.[40]

**37.** See Housing Act of 1949, § 2, 42 U.S.C.A. § 1441 (1969); Department of Housing and Urban Development Act of 1968, §§ 2–10, 42 U.S.C.A. §§ 3531–3537 (1973); cf. Fair Housing Act of 1968, §§ 801–901, 42 U.S.C.A. §§ 3601–3631 (1973).

**38.** E. g., Johnston, Developments in Land-Use Control, 45 Notre Dame Law 399, 408–13 (1970); Comment, Toward Improved Housing Opportunities: A New Direction for Zoning Law, 121 U. Pa.L.Rev. 330, 331 (1972).

**39.** E. g., *Pernell v. Southall Realty,* 416 U.S. 363, 384, 94 S.Ct. 1723, 1734, 40 L.Ed.2d 198 (1974); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Lindsey v. Normet,* 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L. Ed.2d 1189 (1968); *Reitman v. Mulkey,* 387 U.S. 369, 381, 87 S.Ct. 1627, 1634, 18 L.Ed.2d 830 (1967) (concurring opinion); *Berman v. Parker,* 348 U.S. 26, 32–33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954); *Shelley v. Kramer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Block v. Hirsh,* 256 U.S. 135, 156, 41 S.Ct. 458, 460, 65 L.Ed. 865, (1921) (Holmes, J.) ("Housing is a necessary of life."); *Buchanan v. Warley,* 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917). And compare *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), with *James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971).

**40.** E. g., National Advisory Comm'n on Civil Disorders, Report 257 (1968); U. S. President's Comm'n on Urban Housing, A Decent Home (1968). See also National Comm'n on Urban Prob-

Against this background, the Consumer Protection Law was passed. Fully aware of the pressing need for adequate housing and the unequal economic position of landlord and tenant, the Legislature sought to end unfairness and deception in the conduct of trade or commerce. To refuse to apply the Consumer Protection Law to the leasing of residential housing would needlessly insulate a great percentage of market transactions from the Law's salutary antifraud provisions. Only by exalting form over substance could such a course be pursued.

The Legislature directed that consumers were to be safeguarded by the Consumer Protection Law. As earlier explained, tenants are in every meaningful sense consumers.[41] By holding the leasing of housing is covered by the Consumer Protection Law, this Court faithfully gives effect to the legislative mandate.

## II

 It is also maintained that the alleged wrongful acts and omissions of the landlord appellees are not "unfair or deceptive acts or practices" within the meaning of section 3 of the Consumer Protection Law. The Commonwealth proceeded on the theory that the alleged unlawful action of appellees was covered by the statutory proscription against

"any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding."

73 P.S. § 201–2(4)(xiii) (1971). It argues that this section was designed to cover generally all unfair and deceptive acts or practices in the conduct of trade or commerce. We agree.

lems, Building the American City, H.R.Doc. No. 91–34, 91st Cong., 1st Sess. (1969).

**41.** See text accompanying notes 19–20 supra.

The Legislature realized, as has often been stated,[42] that no sooner is one fraud specifically defined and outlawed than another variant of it appears. Rather than restricting courts and the enforcing authorities solely to narrowly specified types of unfair and deceptive practices, the Legislature wisely declared unlawful "any other fraudulent conduct." This is a common and well-accepted legislative response to the mischief caused by unfair and deceptive market practices.[43]

■ Appellees counter this interpretation of the Consumer Protection Law by an appeal to the doctrine of ejusdem generis, which simply means,

> " 'General expressions used in a statute are restricted to things and persons similar to those specifically enumerated in the language preceding the general expressions. . . .' "

42. In *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 193 n. 41, 84 S.Ct. 275, 283–284 n. 4, 11 L.Ed.2d 237 (1963), the Supreme Court refers to the discerning Letter of Lord Hardwicke to Lord Kames, dated June 30, 1759, printed in Parkes, History of the Court of Chancery 508 (1828), quoted in Snell, Principles of Equity 496 (25th ed. 1960):

> "Fraud is infinite, and were a Court of Equity once to lay down rules, how far they would go, and no farther, in extending their relief against it, or to define strictly the species or evidence of it, the jurisdiction would be cramped, and perpetually eluded by new schemes which the fertility of man's invention would contrive."

Other courts have expressed a similar understanding. For instance, one reason articulated in favor of broad interpretations of fraud statutes is that to do otherwise would produce a situation in which

> "a certain class of gentlemen of the 'J. Rufus Wallingford' type —'they toil not neither do they spin'—would lie awake nights endeavoring to conceive some devious and shadowy way of evading the law."

*State v. Whiteaker*, 118 Or. 656, 661, 247 P. 1077, 1079 (1926). See also *Moore v. Crawford*, 130 U.S. 122, 128, 9 S.Ct. 447, 448, 32 L.Ed. 878 (1889); *Kugler v. Romain*, 58 N.J. 522, 541 & n. 4, 279 A.2d 640, 651–652 & n. 4 (1971).

43. E. g., Federal Trade Commission Act, § 5, 15 U.S.C.A. § 45 (1973); Securities Act of 1933, § 17, 15 U.S.C.A. § 77q (1971); Securities Exchange Act of 1934, § 10, 15 U.S.C.A. § 78j (1971); Investment Company Act of 1940, § 36, 15 U.S.C.A. § 80a–35 (1971).

*Butler Fair & Agricultural Association v. Butler School District*, 389 Pa. 169, 178, 132 A.2d 214, 219 (1957) (quoting *Frederick's Estate*, 333 Pa. 327, 331, 5 A.2d 91, 93 (1939)). However, as this Court has long recognized, "[t]his rule is but one of construction and does not warrant a court in confining the operation of a statute within narrower limits than intended by the Legislature." *Commonwealth v. Klucher*, 326 Pa. 587, 590, 193 A. 28, 29 (1937). See 2A J. Sutherland, Statutes and Statutory Construction § 47.22 (C. Sands ed. 1973).

To hold that the general antifraud provision of section 2(4)(xiii) is bound by the specifically-enumerated examples of unfair conduct (§ 2(4)(i) to (xii)) would plainly thwart the legislative intent.[44] Such a holding would negative the Legislature's understanding that "Fraud is infinite" and would allow the broad prohibition of section 3 to be "eluded by new schemes which the fertility of man's invention would contrive." See note 42 supra. This we will not do.

### III

The Commonwealth additionally alleges that four printing companies by the printing of form leases for appellee landlords have violated, and are violating, the Consumer Protection Law. The form sellers demurred, saying that their assertedly unlawful actions were protected by the first amendment to the United States Constitution and by Article 1, section 7 of the Pennsylvania Constitution, P.S. For reasons different from those offered by appellee form sellers, we agree that on this record they cannot be enjoined under the Consumer Protection Law from printing form leases.

In our view, the Legislature's intent compels this result. "When the validity of an act of the [Legislature] is drawn in question, and if a serious doubt of constitu-

---

**44.** See text accompanying notes 5–10 supra.

tionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided." *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932) (footnote omitted). See *Johnson v. Robison,* 415 U.S. 361, 365, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389 (1974); *United States v. Thirty-Seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971) (plurality opinion).

Here, section 3 of the Consumer Protection Law, as earlier noted, broadly declares unlawful all "unfair or deceptive acts or practices in the conduct of any trade or commerce." But immediately following this declaration, the Legislature excluded from the Law's scope the actions of printers who act "in good faith and without knowledge of the falsity or deceptive character" of what they print. 73 P.S. § 201–3 (1971).

It is certain that the Legislature intended that those who perform the mechanical act of setting type cannot be held liable vicariously for the misrepresentations of those who ordered the printing. This is precisely the instant case. Nothing appears in the record that would indicate that the role of the printers is anything other than mechanical.[45] The Commonwealth has alleged neither that the printers did not act in good faith nor that they had any knowledge of the alleged false and deceptive character of the lease provisions. Thus, as pleaded, the printing of form leases is the sort of mechanical act excepted from the coverage of the Consumer Protection Law.

IV

Appellees also filed preliminary objections in the nature of a demurrer. Even though the Commonwealth

45. Our holding that the Consumer Protection Law excludes from its scope the printers of form leases also covers those who perform the mechanical act of distributing printed form leases.

Court decided that the Consumer Protection Law did not apply to the leasing of residences, it went on to consider appellees' demurrer. That court treated appellees as if there were a single defendant demurring to the Commonwealth's complaint. It held that the Commonwealth failed to state a cause of action.

A demurrer admits as true all well-pleaded facts and all inferences reasonably deducible from them, but not any conclusions of law. *Reardon v. Wilbur*, 441 Pa. 551, 554, 272 A.2d 888, 890 (1971); *Clevenstein v. Rizzuto*, 439 Pa. 397, 400–401, 266 A.2d 623, 624–625 (1970); *Hoffman v. Misericordia Hospital*, 439 Pa. 501, 503–504, 267 A.2d 867, 868 (1970). Only if "upon the facts averred, the law says with certainty that no recovery is permitted," *Clevenstein*, supra, 439 Pa. at 401, 266 A.2d at 625, will this Court sustain the demurrer. "Where a doubt exists as to whether a demurrer should be sustained, this should be resolved in favor of overruling it." Id.; see *King v. United States Steel Corp.*, 432 Pa. 140, 143–144, 247 A.2d 563, 565 (1968).

Although the Commonwealth Court concluded that no cause of action had been stated, it did not consider the Commonwealth's allegation of misleading conduct created by the use of leases with "archaic and technical language beyond the easy comprehension of the consumer of average intelligence." Because the hearing court did not pass on whether the Commonwealth set forth a cause of action with respect to this claim, we cannot say that no recovery is possible. Accordingly, we remand to the Commonwealth Court for it to rule on this allegation.

That court did pass on the Commonwealth's remaining claims for relief. It was also alleged that the use of lease provisions [46] which "are illegal, unconscionable and unconstitutional and hence unenforceable" violat-

---

**46.** These provisions, the use of which is alleged to be unlawful, are set out in text immediately preceding notes 1–2 supra.

ed the Consumer Protection Law. The gravamen of this alleged violation is that the use of lease clauses which are unenforceable because of either legislation or judicial decision is misleading to the consumer of housing services. As pleaded, the predicate for the Commonwealth's theory is that the provisions are unenforceable in all circumstances. The Commonwealth Court assiduously reviewed the existing law of this and other jurisdictions, 10 Pa. Cmwlth. at 611–615, 314 A.2d at 340–342, and came to the conclusion that it was unable to "determine as a matter of law that the clauses generally described by the Commonwealth in its complaint are in fact unlawful or unconstitutional." Id. at 615, 314 A.2d at 342 (footnote omitted). Phrased alternatively, that court concluded that the law was settled that these provisions were not unenforceable in all circumstances. We agree with the Commonwealth Court's analysis of the existing law, and of necessity with its conclusion that this allegation, as pleaded, failed to state a cause of action.

The Commonwealth Court next addressed the claim that the landlords' failure to inform tenants in the leases of the existence of statutory tenant remedies [47] constituted an unfair or misleading practice. The sole reference to this allegation is the statement of the Commonwealth Court that

"we can find no law which would require a landlord to notify a tenant of his rights under The Landlord and Tenant Act."

10 Pa.Cmwlth. at 616, 314 A.2d at 342.

This assertion misperceives the issue, however. The question is whether the Consumer Protection Law requires a landlord to notify a tenant in a lease of the tenant's statutory rights, because allegedly the absence of this notification is misleading or confusing to the tenant as consumer of housing services.

47. Some of these remedies are nonwaivable. See note 2 supra.

One of our trial courts has already held that the Consumer Protection Law contemplates that in "appropriate circumstances, a court may require affirmative disclosures by a seller to prevent misrepresentation and deception . . . ." *Commonwealth v. Foster*, 57 Pa.D. & C.2d 203, 208 (C.P. Allegheny County 1972). This holding is completely in accord with the federal view that section 5 of the FTC Act authorizes affirmative disclosure if the absence of such disclosure is misleading to the consumer.[48]

 Moreover, the common law of misrepresentation clearly envisions that the omission of a material fact may be actionable. As long ago as 1877, this Court stated, "It needs no citation of authorities to prove that the wilful . . . concealment of a material fact by the vendor constitutes a fraud." *Krumbhaar v. Birch*, 83 Pa. 426, 428 (1877). Accord, *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285–86, 285 A.2d 451, 454 (1971), cert. denied, 407 U.S. 920, 92 S.Ct. 2459, 32 L. Ed.2d 806 (1972); *Neuman v. Corn Exchange National Bank & Trust Co.*, 356 Pa. 442, 51 A.2d 759, supplemented per curiam, 52 A.2d 177 (1947);[49] *Croyle v. Moses*, 90 Pa. 250, 252 (1879); *Rheem v. Naugatuck Wheel Co.*, 33 Pa. 358, 365 (1859) (suppression of material fact); *Cor-*

**48.** See, e. g., *Ward Laboratories, Inc. v. FTC*, 276 F.2d 952, 955 (2d Cir.) (collecting cases), cert. denied, 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed.2d 55 (1960); *Keele Hair & Scalp Specialists, Inc. v. FTC*, 275 F.2d 18, 23 (5th Cir. 1960); *S. S. S. Co. v. FTC*, 416 F.2d 226, 229–231 (6th Cir. 1969); *J. B. Williams Co. v. FTC*, 381 F.2d 884, 890–891 (6th Cir. 1967); *Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir.), cert. denied, 375 U.S. 944, 84 S.Ct. 349, 11 L.Ed.2d 274 (1963); *Feil v. FTC*, 285 F.2d 879, 898–901 (9th Cir. 1960); *Portwood v. FTC*, 418 F.2d 419, 424 (10th Cir. 1969); cf. *Alberty v. FTC*, 86 U.S.App.D.C. 238, 182 F.2d 36, 39–40, cert. denied, 340 U.S. 818, 71 S.Ct. 49, 95 L.Ed. 601 (1950). See generally *FTC v. Ruberoid Co.*, 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081 (1952).

**49.** "The deliberate nondisclosure of a material fact amounts to culpable misrepresentation no less than does an intentional affirmation of a material falsity . . . ." 356 Pa. at 451, 51 A.2d at 764.

*nelius v. Molloy*, 7 Pa. 293, 296 (1847) ("under peculiar circumstances, even silence will be deemed a fraud"). See generally, 1 F. Harper & F. James, The Law of Torts § 7.14 (1956).

Dean Prosser writes that the common law developed the rule that

"the lessor, like a vendor, is under the obligation to disclose to the lessee concealed dangerous conditions existing when possession is transferred, of which he has knowledge. There is 'something like fraud' in a failure to give warning of a known hidden danger to one who enters upon the assumption that it does not exist; and the lessor will be liable to the lessee or to members of his family for his non-disclosures."

W. Prosser, Handbook of the Law of Torts 401 (4th ed. 1971) (footnotes omitted).

Recently, the Supreme Court of Indiana applied this principle to a situation analogous to the present case. *Weaver v. American Oil Co.*, 257 Ind. 458, 276 N.E.2d 144 (1971). There, a landlord-oil company used a printed form lease "which contained, in addition to the normal leasing provisions, a 'hold harmless' clause which provided in substance that the leasee [sic] operator would hold harmless and also indemnify the oil company for any negligence of the oil company occurring on the leased premises." 257 Ind. at 459, 276 N.E.2d at 145. The lessee-filling station operator was injured on the leased premises by an employee of the oil company. The Indiana court refused to enforce the lease provision. In so holding, that court in effect treated the lease as a commodity and placed on the landlord with super bargaining power the responsibility of impliedly warranting the fitness of the lease.

"The burden should be on the party submitting such 'a package' [i. e., a standardized mass contract] in printed form to show that the other party had knowledge of any unusual or unconscionable terms contained there-

in. The principle should be the same as that applicable to implied warranties, namely that a package of goods sold to a purchaser is fit for the purposes intended and contains no harmful materials other than that represented. Caveat lessee is no more the current law than caveat emptor. . . .

. . . The party seeking to enforce such a contract has the burden of showing that the provisions were explained to the other party and *came to his knowledge* and there was in fact *a real and voluntary meeting of the minds and not merely an objective meeting.*"

257 Ind. at 464, 276 N.E.2d at 147–148 (emphasis in original).

This holding is in harmony with Dean Prosser's view of the future path of the common law.

"The law appears to be working toward the ultimate conclusion that full disclosure of all material facts must be made whenever elementary fair conduct demands it."

W. Prosser, Handbook of the Law of Torts 698 (4th ed. 1971) (footnote omitted).

These authorities undermine the Commonwealth Court's opinion that no law exists requiring affirmative disclosure of the tenant's statutory rights. However, rather than considering on this stark record whether the Commonwealth pleaded a cause of action with respect to its claim of misleading failure to disclose, we believe the wiser appellate course is to remand to the Commonwealth Court. In this fashion, the hearing court will have the opportunity to pass fully on this claim and establish a record adequate for its determination and for appellate review. We believe the procedural situation is analogous to one in which a trial court employs an incorrect standard; our practice there is to remand for further proceedings in light of the appropriate standard. This procedure makes especially good sense here since a

remand is already required due to the failure of the Commonwealth Court to rule on the "archaic language" claim.

## V

Finally, the Commonwealth Court held that it was not authorized to order the relief requested by the Commonwealth. We think, however, it premature at this stage of the proceedings to reach this question.

On remand all properly-preserved preliminary objections except the question of the jurisdictional reach of the Consumer Protection Law will be open.

That portion of the order of the Commonwealth Court that dismissed the Commonwealth's complaint for failure to state a cause of action with respect to the use of "unenforceable" lease provisions is affirmed. For reasons different than those advanced by the Commonwealth Court, that portion of its order dismissing the complaint with respect to the form sellers is also affirmed. In all other respects the order is vacated and the case remanded for proceedings consistent with this opinion.

POMEROY, J., filed a dissenting opinion in which JONES, C. J., joins.

POMEROY, Justice (dissenting).

The opinion of the Court, while conceding that the words of the Unfair Trade Practices and Consumer Protection Law are "not . . . free of all ambiguity," (opinion of the Court at 820) (a conclusion I do not share) nevertheless concludes that the leasing of residential real estate is covered by the Law, and that in so holding "this Court faithfully gives effect to the legislative mandate" (opinion of the Court at 826). Believing that this result is reachable only by a forced and strained

reading of the statute, I must respectfully dissent. The highly laudable objective of consumer protection, including the modernization of the typical archaic forms of printed leases in widespread use, should not, in the name of a "pragmatic approach" and "a functional stance," serve to change the normal rules of statutory construction.

The Law starts with a section of definitions. "Trade" and "Commerce" are defined in terms of "sale", viz., "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed . . . ." It then defines the phrases "unfair methods of competition" and "unfair or deceptive acts or practices" (which are used synonymously) as meaning any one or more of ten enumerated practices relating to "goods or services." [1] The eleventh

---

1. (4) "Unfair methods of competition" and "unfair or deceptive acts or practices" mean any one or more of the following:

(i) Passing off goods or services as those of another;

(ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

(iv) Using deceptive representations or designations of geographic origin in connection with goods or services;

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

(vi) Representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand;

(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

(viii) Disparaging the goods, services or business of another by false or misleading representation of fact;

(ix) Advertising goods or services with intent not to sell them as advertised;

(x) Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(xi) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

unfair practice has to do with making false or misleading statements as to price reductions and the twelfth with promising any compensation "for the procurement of a contract of purchase." The thirteenth and last unfair trade practice is a catch-all, viz., "[e]ngaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding." Having thus defined its terms, the legislature in the next section (Section 3) of the Law declares these unfair trade practices in the conduct of any trade or commerce to be unlawful. Section 7 provides for the avoidance by a consumer under certain conditions of a contract of sale or sale where the "merchandise" involved has a sales price of $25.00 or more.

It seems obvious that the leasing of real estate is not embraced within the definitional provisions, which are solely directed to the sale and distribution of "goods or services." Indeed, the plain design and purpose of the Law is the protection of persons involved in the purchase of consumer goods. The Commonwealth in its brief (p. 22) points to the catch-all clause (xiii) of the definitional section, *supra*, n. 1, which provides that "engaging in any other fraudulent conduct which creates a likelihood of confusion or misunderstanding" is an unfair trade practice, and the Court embraces this approach. Clearly, however, this clause must be read, under the familiar rule of *ejusdem generis*, as having reference to the same general subject matter as the specific clauses which precede it. Statutory Construction Act of 1972, 1 Pa. S. § 1903(b) (Spec.Pamphlet, 1973). *Butler Fair & Agricultural Association v. Butler School District*, 389 Pa. 169, 177, 178, 132 A.2d 214 (1957). When our task is to de-

(xii) Promising or offering to pay, credit or allow to any buyer, any compensation or reward for the procurement of a contract of purchase with others;

(xiii) Engaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding.

1968, Dec. 17, P.L. 1224, No. 387, § 2.

termine the scope which the legislature intended a statute to have, it is circular in the extreme to pass off the *ejusdem generis* rule by stating that it " 'does not warrant a court in confining the operation of a statute within narrower limits than intended by the Legislature.' " (opinion of the Court at 827 quoting from *Commonwealth v. Klucher*, 326 Pa. 587, 193 A.2d 28 (1937).) It may be granted, as the Court suggests, that "purchasers of rental housing" (opinion of the Court at 822) are consumers, but to say as much does not convert a lease into a sale, and I cannot agree that adherence to the normal meaning of words in interpreting a statute is to be "bound by common law formalisms" (ibid.) The Statutory Construction Act of 1972, *supra*, commands that "[w]ords and phrases shall be construed . . . according to their common and approved usage;" 1 Pa. S. § 1903(a). Indeed, we recently so held in interpreting the word "sale" as it is used in The Drug, Device and Cosmetic Act,[2] *Commonwealth v. Simione*, 447 Pa. 473, 291 A.2d 764 (1972). Speaking through Mr. Justice Roberts, we held that "[t]his Court is obligated to construe words employed in the laws of this Commonwealth 'according to their common and approved usage,' " and standard dictionary definitions of "sale" were employed to determine whether the conduct there involved fell within them. 447 Pa. at 480, 291 A.2d at 768.

Guidance for determining the reach of the Unfair Practices and Consumer Protection Law is to be found in the decision of the Supreme Court of the United States in *McBoyle v. United States*, 283 U.S. 25, 51 S.Ct. 340, 75 L.Ed. 816 (1931). The appellant had been convicted of transporting an airplane across state lines, knowing it to have been stolen. The question was whether this act was a violation of the National Motor Vehicle Theft Act. That Act defined the term "motor vehicle" to include "an automobile, automobile truck, automobile wagon, motor-

2. Act of September 26, 1961, P.L. 1664 § 4(q), 35 P.S. § 780–4(q).

cycle, or *any other self-propelled vehicle [not designed for running] on rails."* In holding that an airplane was not included within the catch-all phrase, Mr. Justice Holmes, in his opinion for the Court, said: "[T]he phrase under discussion calls up the popular picture. For after including automobile truck, automobile wagon and motorcycle, the words 'any other self-propelled vehicle not designed for running on rails' still indicate that a vehicle in the popular sense, that is a vehicle running on land, is the theme. It is a vehicle that runs, not something, not commonly called a vehicle, that flies. . . . It is impossible to read words that so carefully enumerate the different forms of motor vehicles and have no reference of any kind to aircraft, as including airplanes under a term that usage more and more precisely confines to a different class. . . . When a rule of conduct is laid down in words that evoke in the common mind only the picture of vehicles moving on land, the statute should not be extended to aircraft simply because it may seem to us that a similar policy applies, or upon the speculation that if the legislature had thought of it, very likely broader words would have been used." 283 U.S. at 26, 27, 51 S.Ct. at 341. While the statute involved in *McBoyle* was a penal one, the applicability of Mr. Justice Holmes' analysis to the case at bar is clear, and to my mind, compelling. The complaint of the Commonwealth is basically directed against certain provisions in the customary printed forms of lease agreements which it labels as fraudulent, illegal, unconscionable and unconstitutional.[3] It also charges that the leases fail to

---

3. The provisions in lease agreements alleged to violate the Unfair Trade Practices and Consumer Protection Law are described in the paragraph (9) of the complaint as follows:
 "(a) lessor's 'right' to distrain for rent,
 (b) lessee's unconditional warrant of attorney,
 (c) lessor's unconditional 'right' to confess judgment,
 (d) lessee's unconditional waiver of unexplained rights, including statutory rights,
 (e) lessor's unlimited discretion to accellerate [sic] lessee's rent,

inform the tenants of their rights under The Landlord and Tenant Act of 1951, Act of April 6, 1951, P.L. 69, as amended; 68 P.S. § 250.101 et seq. This statute, which has been several times amended since its enactment, is, as its title states, "An Act relating to the rights, obligations and liabilities of landlord and tenant and of parties dealing with them and amending, revising, changing and consolidating the law relating thereto." It is a comprehensive statute dealing with the creation of leases, the recovery of rent by assumpsit and distress, exemptions from distress and sale, and recovery of possession. It may well be that in light of modern conditions and the emphasis that is now being placed, and properly, on the rights of consumers, further protective provisions should be enacted for the benefit of tenants. Had the legislature intended to accomplish such a purpose in 1968 when it adopted the Unfair Trade Practices and Consumer Protection Law, it seems evident to me that it would have done so, if not by explicit amendments to The Landlord and Tenant Act,[4] then at least by a method less oblique and obtuse than the majority attributes to it in finding the "legislative mandate" contained in the Unfair Trade Practices and Consumer Protection Law.

> (f) lessee's waiver of claim for lessor's negligence, for himself and for third parties,
> (g) lessor affidavit of default is conclusive evidence of default,
> (h) lessee's waiver to oppose 'amicable' action in ejectment,
> (i) lessee's waiver of demand, notice, right to appeal, to a stay and standing to open or strike judgments."

4. The Landlord and Tenant Act has been amended and supplemented several times since its enactment in 1951. In 1968, for example, the same year which saw the enactment of the Unfair Trade Practices and Consumer Protection Law, there was added to the Landlord and Tenant Act a new section 512, dealing with the recovery by tenants of residential leaseholds of escrow funds improperly held by landlords. Act of May 3, 1968, P.L. 107, No. 56, § 1, 68 P.S. § 250.512. (This section was further amended by the Act of December 29, 1972, P.L. 1698, No. 363 § 2, which Act also added other provisions relative to escrow funds as set forth in §§ 511.1, 511.2 and 511.3, 68 P.S. §§ 250.511a, 511b and 511c. Any attempted waiver of these sections by a tenant is declared void and unenforceable. *Ibid.*)

Finally, I am unpersuaded that the Federal Trade Commission Act is of any help to the appellant in its construction of the Pennsylvania statute. *F. T. C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972), relied upon by the majority, was concerned with trading stamps, not leases. It held that the Federal Trade Commission was not limited by Section 5 of the Act to defining and proscribing as unfair or deceptive practices, those which violated the letter or the spirit of the anti-trust laws, and that practices could be proscribed as unfair or deceptive in their effect on consumers as regardless of their nature or quality as competitive practices or their effect on competition. It is to be noted, moreover, that under that Act the Congress deliberately left it to the F.T.C. to define unfair practices,[5] whereas in the case at bar the legislature itself has made the definitions. The cases cited by the majority wherein the Federal Trade Commission has sought to enjoin practices pertaining to the leasing of personal property are not here pertinent. Furthermore, as the amicus brief of the Trade Commission in our Court acknowledges, "in none of the cases was the fact that the transaction involved a lease even raised as a defense to F.T.C. regulation." (Brief of Federal Trade Commission, p. 11).

Since I disagree with the Court in its holdings as set forth in parts I and II of its opinion, that the Law by its terms includes the subject matter of the present litigation, I do not reach the further matters considered in parts III, IV and V of its opinion. I would affirm the order of the Commonwealth Court dismissing the complaint.

JONES, C. J., joins in this dissent.

---

5. Section 5 of the F. T. C. Act simply provided that "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are hereby declared unlawful." 15 U. S.C. Sec. 45 (1973).