**In re Johnnie Mae SMITH.**

**Johnnie Mae SMITH, Appellant**

v.

**COMMERCIAL BANKING CORP., Buffalo Savings Bank, and its Servicing Agent, Fidelity Bond & Mortgage Co., and James J. O'Connell.**

No. 88–1505.

United States Court of Appeals, Third Circuit.

Argued Nov. 3, 1988.

Decided Jan. 12, 1989.

As Amended April 14, 1989.

Irv Ackelsberg, Eric L. Frank (argued), Community Legal Services, Inc., Philadelphia, Pa., for appellant.

Joseph A. Goldbeck, Jr., Gary E. McCafferty (argued), Philadelphia, Pa., for appellee.

Before GIBBONS, Chief Judge, and BECKER and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This case raises the issue of whether the foreclosure of residential property without either giving the required notice of intention to foreclose until a few days before the sheriff's sale or timely serving the foreclosure complaint constitutes injuries cognizable under the Pennsylvania "unfair or deceptive practices act" (UDAP) or under the Pennsylvania Loan Interest and Protection Law (Act 6). Both the district court and the bankruptcy court concluded that the UDAP did not extend to such injuries. Neither court, however, addressed the claim under Act 6. The plaintiff, Johnnie Mae Smith, appealed, and we reverse.

### I.

Smith purchased a parcel of real estate at 1356 East Rittenhouse Street, Philadelphia, Pennsylvania in 1963 and mortgaged the property to Buffalo Savings Bank (the Bank). The mortgage was insured by the Federal Housing Administration (HUD) and serviced by Fidelity Bond and Mortgage Company of Philadelphia (Fidelity).

Because of health reasons, Smith joined her family in Germany. Prior to her departure she had arranged for her property to be managed by a third-party whose duties included collection of the rents and payment of the mortgage from those rents. Her agent, however, failed to collect the rents and to pay the mortgage. As a result, Smith became delinquent on the mortgage on which she had made monthly payments for approximately seventeen years.

On June 19, 1980, Smith sent Fidelity a notarized letter stating that she was residing in Germany for an indefinite period of time and asking Fidelity to send her an accounting there of the payments due. On July 1, 1980, Fidelity sent the requested information by certified mail to Smith in Germany. At that time, the sum needed to satisfy the delinquency amounted to $1,095.79.

Before the month's end, however, Fidelity instituted mortgage foreclosure proceedings by filing a complaint in the Court of Common Pleas of Philadelphia. The following month the sheriff attempted to effect service of the complaint by delivering a copy to an individual residing on the mortgaged property. Although, as both the bankruptcy court and the district court found, Fidelity knew that Smith did not reside at the property,[1] service was neither

---

1. Fidelity contends that the courts' findings that Fidelity knew, at the time process was served, that Smith resided in Germany and not at the property was clearly erroneous. However, Fidelity's own correspondence to Smith in Germany immediately prior to the service of process belies the validity of its contention. The courts' findings on this point, therefore, are not clearly erroneous.

made on her personally nor at her residence.

The court entered default judgment on the foreclosure complaint in favor of Fidelity on September 4, 1980. Shortly thereafter, Fidelity mailed a "HUD tenant letter" to the occupants of the property. Notably, no such letter was sent to Smith.

Smith did not learn of the foreclosure proceedings until three weeks after entry of the default judgment. She immediately communicated with Fidelity and learned of the impending sheriff's sale of the property on October 6, 1980. Smith requested that the sale be postponed and Fidelity complied by rescheduling the sale for November 3.

With hope of reinstating the mortgage, Smith flew from Germany to Philadelphia and offered Fidelity $1,300. Fidelity declined and stated that the outstanding deficiency now amounted to $1,997.88, consisting of $1,199.38 in delinquent monthly payments and late charges, $774.50 in attorneys' fees, and $24.00 in foreclosure inspection costs.

The sheriff sold the mortgaged property at public sale on November 3 to Commercial Banking Corporation (Commercial), the second lienholder, for $4,600. Smith then leased the property from Commercial.

On October 13, 1981, Smith filed a voluntary petition under Chapter 13 of the Bankruptcy Code. Shortly thereafter, she commenced an adversary proceeding against Buffalo, Fidelity, Commercial, and the bankruptcy trustee,[2] requesting the bankruptcy court to set aside the foreclosure of the property. Commercial settled out of the litigation by selling the property back to Smith for $8,000, of which $7,000 was to be paid pursuant to a ten year mortgage at the rate of 14 percent per annum. After settling with Commercial, Smith sought monetary damages against Buffalo and Fidelity for violations of (1) the UDAP, and (2) Act 6.

The bankruptcy court heard plaintiff's case regarding the UDAP and Act 6 claims on June 17, 1985. Prior to the court's disposition of the case, Smith converted the Chapter 13 proceeding into a Chapter 7 case, and received a Chapter 7 discharge from the bankruptcy court in December 1985. On April 11, 1986, the court entered an order denying Smith any relief under the UDAP or Act 6. Smith filed a timely appeal to the United States District Court for the Eastern District of Pennsylvania which entered an order on May 23, 1988, affirming the judgment of the bankruptcy court. 87 B.R. 329. The plaintiff timely appealed to this court.

The only claims remaining before this court are the claims arising under Pennsylvania law which Smith contends are properly before this court as related to the original bankruptcy claim under 28 U.S.C.A. § 157 (West Supp.1988).[3] Although the bankruptcy court found that Fidelity failed to make proper service of the foreclosure complaint upon Smith, it concluded, without discussion, that plaintiff had no action for Fidelity's conduct under the UDAP. 59 B.R. 298, 301 (Bankr.E.D.Pa.1986). The district court, on appeal, agreed with the bankruptcy court that improper service of the complaint did not constitute an injury cognizable under the UDAP, concluding that "[e]ven if the failure to give notice constituted a material omission, Smith was not damaged.... Any prejudice to Smith from the improper service was cured by the [30 day] postponement of the sheriff's sale."

## II.

The threshold issue is whether the federal courts properly continued to exercise jurisdiction over these proceedings. Fidelity contends that the discharge of the

---

**2.** The Chapter 13 trustee is a nominal defendant. Plaintiff makes no claims against him.

**3.** When the complaint was originally filed, plaintiff claimed jurisdiction under 28 U.S.C. § 1471 (1982) which provided that the bankruptcy courts and the district courts could assume jurisdiction over "all civil proceedings arising un-

der title 11 or arising in or related to cases under title 11." Section 1471 has since been repealed and replaced by 28 U.S.C.A. §§ 157, 1334 (West Supp.1988), governing jurisdiction in the bankruptcy and district courts, respectively. The pertinent language of section 1471 has, however, been retained in toto.

plaintiff in the underlying bankruptcy proceeding, upon which jurisdiction over these claims originally depended, deprived the bankruptcy court of jurisdiction over the related claims.[4] As appellees correctly note, for an action to be related to a bankruptcy case, its outcome must potentially have some effect on the bankruptcy estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankrupt estate. *See Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984). Appellees fail, however, to distinguish between the determination of the existence of jurisdiction at the outset of these proceedings and the determination of whether "related" claims should be dismissed with the dismissal of the bankruptcy case or the discharge of the debtor.

As a general rule, the dismissal of a bankruptcy case should result in the dismissal of "related proceedings" because the court's jurisdiction of the latter depends, in the first instance, upon the nexus between the underlying bankruptcy case and the related proceedings. *See In re Stardust Inn, Inc.,* 70 B.R. 888, 890 (Bankr.E.D.Pa.1987). The question remains, however, whether the court may exercise its discretion to retain jurisdiction over the related claims after the termination of the bankruptcy proceedings.

The few bankruptcy courts which have addressed this issue have held that the general rule that dismissal of a bankruptcy case terminates all adversary proceedings filed in that case is not without exception. *See, e.g., Stardust Inn,* 70 B.R. at 891; *In re Pocklington,* 21 B.R. 199, 201 (Bankr.S. D.Cal.1982). Drawing upon an analogy to the disposition of ancillary and pendent claims, the courts have held that they may consider a number of factors to determine whether jurisdiction should be retained. These factors include: (1) judicial economy; (2) fairness and convenience to the liti-

gants; and (3) the degree of difficulty of the related legal issues involved. *See Stardust Inn,* 70 B.R. at 891.

Here, the existence of two of these factors persuades us that the bankruptcy court properly retained jurisdiction over the related claims. First, the court's interest in judicial economy argues in favor of the retention of jurisdiction. The core proceedings had been before the bankruptcy court for over four years and it had approved settlement of related litigation with Commercial, one of the defendants to this litigation. To have remanded at that stage to the state court would have served no purpose and would have wasted unnecessarily the resources and energies already invested by the parties and the court. Second, it would be unfair and would serve no useful purpose to compel Smith to bear the cost of and delay of a retrial in the state court at this time, simply because of the unfortunate way in which the bankruptcy court timed its orders. For these reasons, the bankruptcy court did not abuse its discretion in retaining jurisdiction over the related proceedings notwithstanding the earlier discharge of the debtor.

### III.

Smith raises two issues on appeal. First, whether the invalid service of process, resulting in a default judgment, constitutes an unfair or deceptive practice or act in violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.Stat.Ann. § 201–1 *et seq.* (Purdon Supp.1988) (UDAP). Second, whether the defendants violated Act 6, Pa.Stat.Ann. §§ 403, 504 (Purdon Supp.1988), by failing to send Smith the required thirty day pre-foreclosure notice advising her, inter alia, of the lender's intention to institute foreclosure suit if the default is not cured. Because both these issues involve determinations of mat-

---

**4.** Fidelity admitted in its answers to the original and amended complaints that plaintiff properly invoked jurisdiction pursuant to 28 U.S.C. § 1471, now 28 U.S.C.A. §§ 157 and 1334. Presumably, Fidelity does not now contend that the state law claims raised by the appellant would not be

related to the now discharged bankruptcy claims. The only contention is that this court must decline to decide those state law claims because the core federal proceedings are not also before us.

ters of law, our review is plenary. We turn first to the UDAP.

### A.

The UDAP protects consumers of goods and services from unfair or deceptive trade practices or acts. The objective of the UDAP and other similar state and federal statutes is to "place on more equal terms seller and consumer." *Commonwealth v. Monumental Prop., Inc.*, 459 Pa. 450, 458, 329 A.2d 812, 816 (1974). Specifically, section 3 of the UDAP provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by ... section 2 of th[e] act and regulations promulgated under section 3.1 of this act are hereby declared unlawful." 73 Pa.Stat. Ann. § 201–3. Section 2 of the UDAP enumerates seventeen specific acts which constitute unfair or deceptive acts or practices. Smith contends that Fidelity's conduct falls within the catch-all provision which makes unlawful "[e]ngaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa.Stat.Ann. § 201–2(4)(xvii).

Smith must overcome three hurdles in order to prevail under the UDAP. First, she must establish that mortgage transactions are a trade or commerce within the meaning of section 3 of the UDAP. Second, she must demonstrate that the UDAP grants a private cause of action for injuries sustained from mortgage transactions and activities appurtenant thereto. Third, she must establish that the invalid service of process complained of here is either unfair or deceptive because it is fraudulent conduct creating a likelihood of confusion or misunderstanding within the meaning of sections 2 and 3 of the UDAP.

### 1. Trade or Commerce.

■ Before determining whether the conduct here is unfair or deceptive, we

must determine whether that conduct occurs within the context of a trade or commerce covered by the UDAP. The first issue is, therefore, whether a mortgage transaction constitutes trade or commerce within the scope of the UDAP. If it does not, that ends our inquiry.

Statutes prohibiting unfair trade practices and acts have routinely been interpreted to be flexible and adaptable to respond to human inventiveness. In construing section 5 of the Federal Trade Commission Act relating to unfair trade practices, for example,[5] the Supreme Court determined that the Act was to be both broad in sweep and flexible in application. The Court's conclusion rested primarily upon the House Conference report which admonished that:

> It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task.

*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 240, 92 S.Ct. 898, 903, 31 L.Ed.2d 170 (1972) (quoting H.R.Conf.Rep. No. 1142, 63d Cong., 2d Sess. 19 (1914)).

Courts generally have adopted a similar "broad and flexible" approach with respect to the UDAP. *See, e.g., In re Jungkurth,* 74 B.R. 323, 324 (Bankr.E.D.Pa.1987); *In re Russell,* 72 B.R. 855, 871 (Bankr.E.D.Pa. 1987); *Monumental Properties,* 459 Pa. at 465–66, 329 A.2d at 819–20. Noting that not only did the legislature fail to define "unfair or deceptive" by reference to specific practices or acts but that it also specifically excluded particular acts and practices from the Act's scope, the courts understandably have been reluctant to expand the scope of exclusions absent express con-

---

**5.** Because of the strong similarity in language and purpose between the UDAP and both the FTCA and Lanham Act, the courts frequently look to these federal statutes for guidance in

interpreting the UDAP. *See In re Andrews,* 78 B.R. 78, 82 (E.D.Pa.1987); *Monumental Properties,* 459 Pa. at 462, 329 A.2d at 818.

gressional authorization. Instead, relying upon the all-inclusive language of the UDAP, the courts have applied the proscriptions of the UDAP to a variety of acts and practices. *See, e.g., Culbreth v. Lawrence J. Miller, Inc.,* 328 Pa.Super. 374, 392, 477 A.2d 491, 501 (1984) (insurance agreements); *Pennsylvania Retailers' Ass'n v. Lazin,* 57 Pa.Cmwlth. 232, 426 A.2d 712, 718 (1981) (debt collection); *Monumental Properties,* 459 Pa. at 466, 329 A.2d at 820 (leasing of residences).

Moreover, the practice of mortgages and mortgage financing has not escaped application of the UDAP. *See Andrews,* 78 B.R. at 82; *Jungkurth,* 74 B.R. at 335; *Russell,* 72 B.R. at 872. As the court in *Andrews* concluded, " 'the business of mortgage lenders is the sale of a service' within the scope of the UDAP." 78 B.R. at 82. Certainly, the mortgage transaction has all the ear-markings of a sale of a service within the scope of the UDAP:

> The relationship of borrower and mortgage broker involves such [sales] activities. The broker is manifestly engaged in the business of selling his services in procuring a loan which is most favorable to the needs and resources of the potential borrower who, in turn, has sought to obtain a broker who can best represent his interests in securing proper financing. While no tangible property of any kind moves through commerce because of this relationship, an exchange of value does occur as the result of this process of securing a broker as the representative of the potential borrower.

*Johnson v. Phoenix Mutual Life Insurance,* 300 N.C. 247, 266 S.E.2d 610, 620 (1980) (interpreting language similar to the UDAP).

Notably the Office of Attorney General, Bureau of Consumer Protection, pursuant to rulemaking authority under section 3.1 of the UDAP, has recently promulgated regulations of Loan Broker Trade Practices, 37 Pa.Code Ch. 305. These regulations recognize that the activities of the residential mortgage industry constitute a trade within the meaning of the UDAP and that certain acts or practices by loan brokers require regulation to provide adequate protection to borrowers.

### 2. Private right of action.

■ We next turn to the issue of whether a consumer's private cause of action under section 9.1 extends only to those acts or practices which have induced the consumer to enter into the mortgage agreement. Fidelity argues that Smith has failed to state a cause of action under section 9.2, contending that the section is actions. Fidelity further argues that even if mortgages fall within section 9.2, the conduct complained of, namely, invalid service of process, did not induce Smith to enter into the mortgage agreement and therefore is beyond the scope of the section. We hold that the scope of section 9.2 is not limited to the initial mortgage agreement only, but includes transactions and dealings between the parties during the life of the mortgage.

Section 9.2 provides that "any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, *as a result of* the use or employment by any person of a method, act or practice declared unlawful by section 3 of [the UDAP] may bring a private action to recover [damages]...." 73 Pa.Stat.Ann. § 201–9.2 (emphasis added). In *Mason v. National Central Bank,* 19 D & C.3d 229 (Chester County Ct.C.P.1980), the plaintiff alleged that the defendant bank induced her by deception into surrendering possession of her vehicle in which the bank held a security interest. Relying entirely upon the language that plaintiff must "thereby" suffer a loss, the court concluded that, in order to

state a cause of action, "the loss must follow the purchase, and ... the purchase itself must have been due to a deceptive practice." 19 D. & C.3d at 232. Because the alleged deceptive conduct occurred months after the purchase, the court held that plaintiff failed to state a cause of action under section 9.2. *Id.; see also DiTeodoro v. J.G. Durand Int'l*, 566 F.Supp. 273, 275 (E.D.Pa.1983) (adopting conclusion of *Mason*).

This interpretation, however, unnecessarily restricts the timing and sequence of events under section 9.2. The language of the statute places only two express limitations: (1) the purchase of goods or services must lead to a loss as a result of an unfair or deceptive act or practice, and (2) the class of litigants includes only those persons who purchase or lease goods or services primarily for consumer use rather than for commercial use. Although it is clear that the loss must follow the purchase of goods or services, the language does not compel the conclusion that the unfair or deceptive conduct must have induced the consumer to make such a purchase.

Instead, the section appears merely to provide a private remedy for all violations of section 3 which might otherwise escape remedy because they do not affect the public interest and would not therefore be subject to enforcement by the Attorney General under section 4 of the UDAP. A contrary conclusion would insulate all kinds of practices from the UDAP, such as debt collection, which occur after entering an agreement and which were not a basis for the original agreement. The adoption of such a restrictive approach, moreover, would undermine the legislative goal of eliminating a broad range of unfair and deceptive practices attributable to the unequal bargaining position existing between consumers and sellers in the marketplace. Therefore, we reject the more narrow interpretation that the only practices permitting a private right of action under the UDAP are those which induce the consumer to

enter into the initial agreement with the seller. We conclude that, given the other restrictions discussed, section 9.2 is intended to be coextensive with section 3 of the UDAP.

### 3. Unfair or deceptive conduct.

█ Having concluded that Smith may properly allege a private cause of action under section 9.2, we next turn to the issue of whether Fidelity's conduct constitutes an unfair or deceptive act under the UDAP.

As initially drafted, the UDAP prohibited unfair and deceptive practices generally. However, in 1976 it was amended so as to make unlawful only unfair and deceptive practices "as defined by subclauses (i) through (xvii) of clause (4) of section 2 of this act." 73 Pa.Stat.Ann. § 201–3 (Purdon Supp.1988). As noted above, the only subclause relevant to the case at bar is the catch-all provision, which makes it unlawful to engage "in any other *fraudulent* conduct which creates a likelihood of confusion or of misunderstanding." *Id.* at § 201–2(4)(xvii) (emphasis added). Smith argues that this subsection bans conduct which is unfair and deceptive but does not rise to the level of fraud. We reject that interpretation because we think it ignores the plain language of the subsection and the language of the 1976 amendment, which restricted the UDAP so that it bans only the enumerated activities. We thus agree with the district court that in order to evaluate whether Fidelity has violated this subsection of the UDAP, we must measure its conduct against the elements of common law fraud, which require that a party make a material misrepresentation that another reasonably relies upon to his or her detriment. However, we will nonetheless reverse the district court's decision because we conclude that Smith has demonstrated that Fidelity's conduct was fraudulent.

According to Smith, Fidelity's conduct here included (1) the improper service of the foreclosure action, (2) the failure to

give her at least thirty days' notice of intention to commence foreclosure proceedings, (3) the creation of unnecessary costs and expenses to cure default, and (4) the refusal to accept partial payment in violation of federal regulations. The district court, concluding that Smith failed to state a cause of action, found that (1) the improper service of process,[6] and the failure to give notice of intention to foreclose, even if material omissions, were not "deceptive, misleading, or fraudulent" because the thirty-day postponement of the foreclosure sale cured any damage to Smith; (2) even if Fidelity improperly insisted on payment of fees and costs, there was no recovery under UDAP because the conduct did not involve any misrepresentations or omissions upon which Smith relied; and (3) Fidelity had no obligation to accept partial payment under the HUD regulations because plaintiff tendered such payment after the filing of the foreclosure complaint. The court's conclusion, however, is fatally flawed in that it fails to acknowledge the confusion, misunderstanding, and oppressiveness created by Fidelity's conduct, and the damages incurred by Smith due to the improper service of process and the absence of pre-foreclosure notice.

The district court held that the failure to make proper service of the foreclosure complaint was not actionable under the UDAP because Fidelity's actions were neither deceptive, misleading, or fraudulent. The court erred, however, in its failure to focus upon Fidelity's earlier actions which misled or lulled Smith into a false sense of reliance, ultimately permitting Fidelity to obtain a default judgment and to foreclose on the property.

Specifically, in June 1980, Smith informed Fidelity of her indefinite stay in Germany and requested that all future communications regarding the property be forwarded to her in Germany. In direct response to her request, Fidelity sent an accounting to her in Germany in July 1980,

less than thirty days prior to commencement of the foreclosure action. Fidelity did not, however, mention or intimate in that letter any plans to foreclose on the property, nor did it even intimate that it would refuse to send further communications to her at her address in Germany. Rather, the prompt response supplying the requested information could certainly have led Smith reasonably to believe that any future correspondence or notices regarding the property would be similarly directed to her in Germany. Fidelity's summary institution of the foreclosure proceedings, especially in light of its recent accounting and correspondence with Smith in Germany, and the failure to give her the required thirty day pre-foreclosure notice, *see* note 7 *infra*, therefore contradicted its implicit representation to her that all future communications regarding the status of the property would be sent to her in Germany.

■ A borrower of money, especially the owner of a residential property mortgaged to a lending institution, may reasonably expect that he or she will receive fair and above-board treatment in their dealings and that no undue advantage will be taken by the lender. Here, Fidelity did not accord Smith such fair treatment. Despite an apparently satisfactory relationship spanning approximately seventeen years, and resulting in almost full satisfaction of the debt, and despite Smith's conveyance of her intent to cure any delinquency on the loan, Fidelity swiftly and silently commenced foreclosure and soon thereafter obtained a "snap" default judgment against an unwary and unsuspecting borrower.

Although the failure properly to serve the foreclosure complaint may not by itself be an unfair practice, here we have considerably more. Fidelity's conduct effectively deprived Smith both of an opportunity to cure the default before imposing additional and unnecessary costs and expenses on her, and of her opportunity to defend in

---

**6.** Both the bankruptcy court and district court concluded, and we agree, that the service of the

foreclosure complaint was improper.

court. We hold that such conduct is "unfair" in the most basic sense of the word and fraudulent within the meaning of the UDAP.

■ The district court further erred in concluding that postponement of the foreclosure sale rectified any injury which Smith would otherwise have sustained by the failure to make proper service of the foreclosure complaint. As the Supreme Court has recognized, the failure to give notice, "reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them the opportunity to present their objections," offends the " 'most rudimentary demands of due process of law.' " *Peralta v. Heights Medical Center, Inc.,* —— U.S. ——, 108 S.Ct. 896, 899, 99 L.Ed.2d 75 (1988) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 550, 85 S.Ct. 1187, 1190, 14 L.Ed. 2d 62 (1965)). The Court went on to note that, even where the defendant does not have a meritorious defense, the defendant suffers harm from the mere failure to receive notice. For example, had there been proper service, the defendant might have impleaded third parties, worked out a settlement, paid the debt, or sold the property to raise the needed funds. *Id.* —— U.S. at ——, 108 S.Ct. at 899.

Here, Smith also may have selected a more favorable resolution of the dispute than suffer foreclosure of the mortgage when the debt had almost been liquidated, had she received proper notice of the intended proceedings. For example, prior notice may have enabled Smith to work out

a settlement with Fidelity, or to make partial payment, or Smith may have chosen to sell the property herself. Moreover, if Smith had received notice prior to the initial filing of the complaint, as required by 41 Pa.Stat.Ann. § 403,[7] her options potentially would have been even greater. For example, as the district court implicitly recognized, at that stage the mortgagee would not have incurred substantial attorneys' fees and costs so that Smith's initial offer to pay the debt would have been sufficient to cover the mortgage deficiency. *See In re Schwartz,* 68 B.R. 376, 378 (Bankr.E.D. Pa.1986) (41 Pa.Stat.Ann. § 406 prohibits mortgagee from recovering attorneys' fees and costs incurred prior to or during the thirty-day notice period provided in 41 Pa. Stat.Ann. § 403.)

Even if her offer had still been insufficient, it is arguable that Fidelity would have been obligated to accept partial payment in accordance with the internal regulations of the United States Department of Housing and Urban Development (HUD), assuming such an offer was made prior to the filing of the complaint.[8] As the district court noted, however, once foreclosure proceedings have begun, the lender is no longer obligated to accept such partial payments.

All these options, however, were foreclosed to Smith because of Fidelity's failure to provide proper notice of its intent to foreclose as well as its failure to make proper service of the foreclosure complaint. It is error, therefore, to conclude that

---

**7.** Fidelity failed to provide Smith with thirty-day notice prior to the commencement of any foreclosure proceedings as required by 41 Pa.Stat. Ann. § 403(a). That section reads:

Before any residential mortgage lender may accelerate the maturity of any residential mortgage obligation, [or] commence any legal action including mortgage foreclosure to recover under such obligation, ... such person shall give the residential mortgage debtor notice of such intention at least thirty days in advance as provided in this section.

**8.** HUD regulations provide that a lender of a federally guaranteed mortgage is obligated to

make reasonable efforts to avoid foreclosure, including the acceptance of partial payments on the mortgage. This obligation ceases, though, once the foreclosure proceedings have commenced. 24 C.F.R. § 203.556(d)(4). As discussed, however, *supra* note 7, Pennsylvania law requires that the mortgage lender provide the mortgage debtor with a minimum of thirty days' notice prior to the *commencement* of any foreclosure proceedings. Again, if Smith had notice of the intent to foreclosure, as required by 41 Pa.Stat.Ann. § 403, she might have made such an offer of partial payment, which Fidelity lawfully could not have refused.

Smith suffered no injury as a result of the improper service of the complaint. We conclude, accordingly, that Fidelity's failure to properly serve the foreclosure complaint, particularly in the absence of providing the thirty-day pre-foreclosure notice as required by Act 6, *infra* part B, and its conduct prior to the commencement of the foreclosure proceedings, constituted a violation of the UDAP.

### B.

■ We now turn to the issue of whether Smith has stated a cause of action under Act 6, 41 Pa.Stat.Ann. § 504 (Purdon Supp.1988). That section provides that:

> Any person affected by a violation of the act shall have the substantive right to bring an action on behalf of himself individually for damages by reason of such conduct or violation, together with costs including reasonable attorney's fees and such other relief to which such person may be entitled under law.

As discussed, Act 6 specifically requires that "at least thirty days in advance" of the commencement of residential mortgage foreclosure, the mortgage lender shall give the mortgage debtor notice of such intention. The Pennsylvania Superior Court has held that such notice is mandatory. *General Electric Credit Corp. v. Slawek*, 269 Pa.Super. 171, 176, 409 A.2d 420, 422 (1979). Such notice must, moreover, be sent to the mortgage debtor's last known address if it is different than the address of the residential property subject to the mortgage. 41 Pa.Stat.Ann. § 403(a)–(b). Failure to comply with this mandatory provision, as well as failure to make a good-faith effort to ascertain the current address of the mortgage debtor violates Act 6. *See In re Sharp*, 24 B.R. 817, 821 (Bankr.E.D.Pa. 1982) (foreclosure set aside where lender failed to ascertain last known address of debtor); *see also Main Line Federal Savings & Loan Ass'n v. Joyce*, 632 F.Supp. 9, 10 (E.D.Pa.1986) (proper notice under section 403 is jurisdictional prerequisite for foreclosure action).

Here, there is no doubt that Fidelity heedlessly violated Act 6. Its own files definitely contained information that Smith was not residing at the property. Moreover, Fidelity's correspondence to Smith in Germany recognized that it knew that Smith's current address was in Germany. Therefore, because its failure to send notice to Smith in Germany at her last known address at least thirty days prior to instituting the foreclosure proceedings constituted a violation of Act 6, Smith has a cause of action for damages under section 504 of that Act.[9]

### IV.

Accordingly, the judgment of the district court will be reversed and the case remanded for further proceedings consistent with this opinion. Costs taxed to the Buffalo Savings Bank and Fidelity Bond & Mortgage Company, appellees.

---

**9.** In her pleadings and briefs, Smith did not ask for relief under Act 6 itself, but instead argued that Fidelity's violation of Act 6 entitled her to relief under the UDAP. However, although the claim for Act 6 relief was not raised in her pleadings, we can treat the pleadings as amended to conform with the evidence adduced at trial. *See Nanavati v. Burdette Tomlin Memorial Hospital*, 857 F.2d 96, 104 (3d Cir.1988).