**Sean's Real Estate Service, LLC v. Shawnell Glenn**

C.P. of Allegheny County, no. LT10-401.

*Jeffrey D. Goldman*, for plaintiff.
*Barbara Kern*, for defendants.

FRIEDMAN, *J.*, October 6, 2010—This decision is filed pursuant to Pa. R.C.P. 1038. See also Pa. R.C.P. 227.1(c)(2).

The captioned dispute was tried before the undersigned sitting without a jury. Plaintiff, a residential landlord, seeks to evict defendants from a single-family dwelling

they rented from it. Plaintiff bases its claims on a written document purporting to be a one-year lease between the parties. The grounds for eviction are said to be the violation of several terms of that lease. Defendants admit withholding some rent, but say they were justified, given plaintiff's failures to honor its obligations to them in a timely fashion. Defendants also contend that the written lease is unenforceable by plaintiff because it is a contract of adhesion replete with unconscionable terms.

Defendants have been paying the monthly rent into court pending the outcome of this trial, and, in their counterclaim, demand that a portion of that escrow fund be returned to them. Defendants also contest the eviction, saying they have not materially breached any of the enforceable provisions of the lease and are entitled to reside in the house until the lease expires, at the end of this year.

After consideration of all the evidence, we conclude that defendants are entitled to possession and plaintiff is not. We also conclude that defendants are entitled to retain the unpaid rent that is *not* part of the rents escrowed, as compensation for the deficiencies, many of which remain uncorrected. However, we conclude, in the circumstances, that plaintiff should be given the rent that has been held in escrow by the Department of Court Records, Civil Division.

A threshold legal issue was whether the written lease itself is an unconscionable contract of adhesion which is not deserving of strict enforcement by this court. Another important legal issue that the court noticed during its review of the evidence is whether the written lease is

unenforceable because it lacks consideration. Our findings of fact, listed below, set forth the scenario we find credible. We have tried to group the findings according to the areas of dispute. They are not listed in any particular order of importance. Based on those facts we conclude that there was no additional consideration furnished by plaintiff at the time the written lease was executed and that the tenancy began based on oral agreements only. The oral agreements were made first in November of 2009 and then in December and very early January, no later than January 3, 2010, the date defendants took possession. We also conclude that, even if the written lease is regarded as the operable contract between the parties, it is unconscionable and unenforceable in the circumstances, under the well-settled law of Pennsylvania.

## FINDINGS OF FACT

### AGREEMENTS OF THE PARTIES AND GENERAL BACKGROUND

1. Plaintiff and defendants first began discussions of a rental in November 2009.

2. Plaintiff told defendants that a suitable house would become available and ready for occupancy by December 15, 2009. (We expressly reject plaintiff's evidence that the occupancy date was to have been much later, in the Spring of 2010.)

3. As a result of this representation, defendants gave plaintiff $1,500 to secure the premises for them; at this time (November 2009) no lease was entered into and no copy of plaintiff's form lease was given to defendants.

4. The expected house was not ready as promised on

December 15, and plaintiff offered defendants a different house, the one now at issue.

5. Since defendants had already given notice to their then-landlord that they would be vacating as of the end of December, they agreed to accept the house at issue, subject to conditions to which plaintiff had agreed, as they had no other place to live.

6. Plaintiff was also required by law to obtain an occupancy permit, which would only be issued if many of those same conditions were met.

7. Defendant Trotman is handicapped from a stroke and has little use of her right arm and needs a walker to help her ambulate; defendant Glenn, her daughter, has three school-age children, so their housing requirements are not easily met, especially given the rent they are able to pay.

8. The alternate house, the subject premises, was not brought into compliance by January, although an occupancy permit was eventually issued a few months after defendants and the children moved in.

9. The written lease was not given to defendants for review or signature until January 6, 2010, three days after they had moved into the premises on Sunday, January 3, 2010, based on the oral agreements made before then.

10. Both defendants signed the lease, based on a rapid oral summary of each page which Heather Wise, an agent of plaintiff, went over with them.

11. The court believes that Ms. Wise, in her haste to limit the harm to defendants caused by plaintiff's failure

to meet the December 15 readiness date for the original house, had forgotten to follow the normal administrative practices for formalizing a lease agreement.

12. Although we are unable to say that she intentionally deceived defendants regarding the terms of the lease, she did mislead them at least inadvertently.

13. Ms. Wise knew at the time of the signing of plaintiff's Exhibit 1 (on January 6, 2010) that Ms. Glenn was extremely tired, having just gotten home from working a nighttime assignment.

14. Ms. Glenn had asked if she could come in the next day to sign, but Ms. Wise refused to accommodate her, apparently in the erroneous belief that one day more would make a difference legally.

15. Ms. Wise did not give defendants a fair opportunity to review the lease and did not offer them the ability to consult an attorney about its terms.

16. Ms. Wise marked an "X" in the box on the lease at paragraph 81 (regarding having an attorney review the lease) either after defendants signed it or without bringing it to their attention at the time.

17. If read strictly, the terms of the written lease applicable to the Tenant's obligations are among the harshest and most detailed that this member of the court has ever seen, while the obligations of the landlord are almost non-existent.

18. The written lease has an attachment titled "Rules and Regulations" which goes so far as to say how long a tenant may leave unwashed dishes in the kitchen sink (no

more than one hour).

19. One of the supposedly material violations with which defendants are charged is leaving their dishes in the sink for a longer period, allegedly overnight, on September 16-17, 2010, an allegation we find unsupported by the credible evidence, even if we assume for purposes of argument that such conduct can be a material violation of the lease.

20. Plaintiff did not repair the many items needed to fulfill its promises to defendants.

21. Plaintiff did not deliver to defendants a house that met the borough's requirements for occupancy at the time plaintiff gave defendants possession of the premises.

22. Although most of the repairs promised prior to the January move-in were cosmetic in nature, they were important to defendants.

23. Other defects were found by defendants shortly after they moved in that affected their ability to fully use the premises.

24. Despite having been repeatedly notified of the various problems, plaintiff failed to correct most of them.

25. A malfunctioning water heater was the only item that the credible evidence shows was repaired in a timely fashion.

## DEFECTS DISCOVERED AFTER TENANCY BEGAN

26. One of the most serious defects was a leak from an upstairs bathroom through the living room ceiling that

was small but was the type that can get larger and cause sudden harm to people or possessions in the living room.

27. There was also a small leak near or through a light fixture, which plaintiff's principal, Sean Kerrigan, said must not have been much of a leak because the ceiling tile was still in place.

28. Although that small leak may not have been serious even though it appeared to be coming from a light fixture, plaintiff had no way of knowing this at the time or since.

29. Plaintiff ignored defendants' requests to repair the leak near or through the light fixture and has refused even to examine the leak to find its source.

30. It is undisputed that the previously undamaged ceiling tile from which the light fixture was suspended later sustained water damage from some source; the appearance was one of danger, not merely unsightliness. The evidence remains unclear and we find that the risk of a dangerous condition had not been eliminated as of the time of trial.

31. Another serious defect involved some of the radiators in the house which blew out water from the steam heat, most probably as the steam cooled.

32. This problem could only be avoided by the defendants turning off the radiators that did this, to avoid damage to their possessions.

33. As a result, defendants did not have enough heat in the affected rooms and could not use them.

34. The court expressly rejects plaintiff's suggestion that the damage to the walls and floors caused by the

radiators (see, for example, defendants' Exhibit E-1 and E-2) was caused by an air conditioning unit leaking from a window above the damaged area.

## DOG ISSUES

35. The court expressly rejects plaintiff's contention that there are large amounts of dog excrement shown in the photos Mr. Kerrigan took of the basement on September 17, 2010. See plaintiff's Exhibit 20. We note that those photos had been mistakenly dated September 16, 2010 by plaintiff's counsel.

36. It is undisputed that a dog, stipulated to have been owned by a friend of Ms. Glenn, Latina Luster, was sometimes on the premises and was sometimes in the basement and at other times in the yard, when Ms. Luster would come to help Ms. Trotman while Ms. Glenn was at work.

37. We reject the plaintiff's contention that large quantities of dog feces remained in the basement for long periods of time.

38. We take judicial notice of the fact that a dog that poops often pees at the same time, so we find Mr. Kerrigan's testimony credible that there was a urine smell in the basement.

39. However, since the emphasis of plaintiff's evidence related to the dog was on the supposed presence of a large quantity old dried feces rather than on the smell, we find that any urine smell was not a significant problem even from plaintiff's point of view, especially in a basement that the credible evidence showed had long-term leaks from the kitchen sink and a substantial leak in the boiler

room and clearly could not have been otherwise odor-free. See defendants' Exhibits D-1, D-2, D-3 and defendants' Exhibits P-1, P-2 and P-3.

40. We further find that there are both some dried feces and some fresh feces shown in some of the photos contained in plaintiff's Exhibit 20.

41. However, we do not find that there are large amounts of feces, dried or otherwise, as plaintiff claims, nor do we find that the dried feces had accumulated over a long period, as plaintiff would have us believe.

42. Rather, we find that Ms. Glenn's 14-year-old son was not as diligent as Ms. Luster said about picking up all the feces after each visit.

43. Paragraph 45 of the lease, "Pets of Any Kind," bars defendants from having any pets and also from "causing" any pet to be on the premises.

44. The clause does not refer to "permitting" anyone else from bringing their own pets to the premises while otherwise lawfully on the premises, as here. (Since other clauses do refer to the concept of permission, we must strictly construe the omission of that concept with regards to pets against the plaintiff.)

45. Pursuant to the stipulation as to ownership, defendants did not have any pets nor did defendants "cause" Ms. Luster to bring her dog with her; at worst they did not throw her out or ask her not to bring her dog with her.

46. Ms. Luster continued to bring her dog to the premises, based on photos which show it was there on

September 17, 2010. Plaintiff's Exhibit 20.

47. There is no material breach of the lease based on the mere fact that there was a dog who occasionally came to the subject premises with its owner.

48. Any odor of urine in the basement is not necessarily attributable just to the dog at issue and would not be significant given the other obvious sources of unpleasant odor and dampness in the area.

49. Furthermore, there is no evidence that the basement had no such urine smell prior to the defendants moving into the house, evidence that would have been helpful since it is undisputed that the place was a mess when the previous tenants left.

## CARPET

50. Regarding the carpet that plaintiff had promised to replace because paint had been spilled on it prior to defendants' occupancy, we find that it was not replaced, but was simply covered over with another scrap of carpet. See defendants' Exhibit A-1, a photo taken on April 10, 2010, and defendants' Exhibit A-2, a photo taken on September 19, 2010, shortly before the trial began.

51. The "scrap of carpet" repair was not an adequate or acceptable performance of plaintiff's promise to replace the carpet.

## WEEDS AND MAINTENANCE OF BUSHES/ HEDGES AND LAWN

52. We reject plaintiff's contention that defendants have not fulfilled their duties regarding maintenance of

the yard and the cutting of weeds.

53. The credible evidence shows that Ms. Glenn or her son mowed the lawn sufficiently and that the "lawn" supplied by plaintiff was already mostly weeds when defendants moved in.

54. Similarly, we reject plaintiff's contention that defendants did not trim the bushes sufficiently.

55. The credible evidence (mostly photographic) shows some hedges with a few weed "trees" well-ensconced within the hedges and ivy trailing down a wall in front of the house, at the foot of a very steep slope and beside a very steep set of stairs.

56. The ivy itself is not unattractive.

57. The taller weed "trees" clearly have been growing for some time and more likely than not were present prior to defendants' tenancy.

58. They are too tall and too well established to be easily removed by anyone.

59. Any duty to remove those is on plaintiff, not defendants, who cannot be held responsible for letting them grow in the first place.

60. As for the weeds in the rear of the house, on the far edge of the brick-paved alley and beneath a slope down from an upper roadway, we find that there is nothing in the lease that points out to defendants that this area is also part of the leasehold and that they were therefore obligated to maintain it. If plaintiff owns the underlying fee, as Mr. Kerrigan testified, it has not shifted responsibility for its maintenance to defendants. See defendants' Exhibit

M-5 and plaintiff's Exhibit 23, and plaintiff's Exhibit 1, paragraph 8, "Rental Address."

61. The slope and lower wall appear to be part of an easement for the upper roadway and the slope also appears to have been mowed by someone else, not defendants as far as the evidence shows. Ms. Glenn testified, credibly, that she was unaware that the premises included anything on the other side of what she believed (reasonably) was a public alleyway.

62. We make these findings despite a citation from the borough against Ms. Glenn for a violation of a section of the borough code, since the language of the section is not in evidence in any form. We note that even the borough officer who was called by plaintiff, to testify mainly about the occupancy permit and related violations committed (and supposedly later corrected) by plaintiff, could not say what the terms of the code section were nor how defendants may have violated it.

63. We also must disregard the pure hearsay statement that a bench warrant has been issued for one or both defendants based on their supposed non-appearance at a hearing on the citation. The record is bereft of any reliable evidence to support this statement. Even if there was no objection to the statement (we do not recall there being one) so that it was admitted by waiver, we, in our role as factfinder, cannot accept that it is *true* that a bench warrant has been issued. We also note that the issuance of a bench warrant for non-appearance is not the legal equivalent of a conviction on the merits.

## BROKEN STAIR TREADS ON EXTERIOR FRONT STEPS

64. Regarding defendants' contention that plaintiff had recently failed to repair two broken or missing treads on the front exterior stairway, we reject that because the credible evidence shows that Ms. Trotman erroneously believed the interior cellar steps were where the damaged treads were and directed Mr. Kerrigan there on September 17th when he came to see the problem. (We note that this was also why he had access to the house on that day and why he was able to take the photos shown in plaintiff's Exhibit 20 of the basement and the dog feces, as well as the dog itself with Ms. Trotman.)

65. The *exterior* front steps leading up to the front of the house do have at least two broken or missing treads that should be repaired by plaintiff forthwith. Defendants' Exhibit L is a photo marked by Ms. Glenn to show which steps those are. We assume that plaintiff will fix these now that it is clear which steps defendants were talking about. Since children play in that area, according to the credible evidence, the defective treads do constitute a safety hazard to them. They are also a hazard to anyone who is unaware that the back entrance is the preferred one.

## WATER BILL ISSUES

66. Plaintiff has asserted that defendants breached the lease by not getting the water bill put in their name. We find that defendants' position is credible, that the water company would not agree to put the water in a non-owner's name, since it wants to be able to place a lien on the property for non-payment. Paragraph 10 of the lease deals with this issue as do paragraphs 11 and 12.

67. Plaintiff did not require any deposit from defendants "as guarantee for any unpaid Water/Sewage" (inter alia) as contemplated by paragraph 10 of the lease.

68. Plaintiff did require defendants to *pay* for water and sewage along with most other utilities and services.

69. Defendants paid the water company in what was believed to be a timely manner, based on what was legible in the photocopies of the bills that plaintiff sent to defendants.

70. The most recent bill may have been due by September 8, 2010, according to the testimony of Ms. Wise, the only witness who appears to have actually seen the original bills. (The original bills were not offered into evidence.)

71. Ms. Glenn reasonably believed that September 8th was not the due date but rather referred to something else (such as the date of any meter reading or the date the bill was issued) and we believe her testimony that she had intended to pay it by the end of September.

72. Any delay in prompt payments of water bills has resulted in no harm to plaintiff, as there is no evidence that the subject real estate has been liened or is likely to be liened as a result of such a short delay (3-4 weeks at most).

## REMOVAL OF A KITCHEN CABINET/ BREAKFAST COUNTER

73. Defendants removed the cabinet/counter at issue with the oral permission of Ms. Wise when they first inspected the premises prior to moving in and saw that the

cabinet was titled and not usable. The cabinet is still on the premises and will be available to plaintiff to repair and reinstall after defendants' tenancy expired.

## PAINTING DONE BY DEFENDANTS

74. The beige paint put on one of the walls by defendants was put there with the oral permission of Ms. Wise, given prior to the defendants moving in.

75. The beige color is a "neutral" color as specified by Ms. Wise when she gave her permission.

## DAMAGE TO EXTERIOR DOOR LOCK CAUSED BY PLAINTIFF

76. Plaintiff was successful at the magistrate level in obtaining an order of eviction.

77. Defendants filed a timely appeal, thereby staying the eviction order.

78. Before plaintiff learned of the timely appeal, Mr. Kerrigan had gone on the premises and had begun to remove a deadbolt lock to change the key and prevent defendants from entering the premises.

79. He then replaced the same lock but neglected to line it up correctly, so the bolt in the edge of the door does not fit into the hole on the door jamb; as a result, the deadbolt no longer functions and defendants have to rely on the flimsier doorknob lock to keep the door secure.

80. Plaintiff's failure to restore the erroneously

removed deadbolt lock to working condition is a material breach of the lease.

## SMOKE DETECTOR

81. Defendants did not remove any smoke detector. plaintiff Exhibit 21, page 1, top photo, which is a photo of a place where a smoke detector may have been in the past, is not sufficient proof that *defendants* removed one or that one needed to be there at all. We believe defendants' evidence on this point. See also testimony of David Miller, who is the borough's code enforcement officer and is also a fire marshal, where he stated that he told plaintiff to remove one of the smoke detectors.

## METAL LOUVERS AND POSTS

82. Plaintiff's contention that defendants damaged the metal louvers on the porch is not supported by sufficient credible evidence.

83. We also reject plaintiff's contention that the louvers provided a safety function, as they appear to be quite flimsy.

84. Plaintiff appears also to suggest that their vertical pieces were some kind of substantial support, and if that is its position, we reject that as well.

85. The louvers appear to be fairly old, maybe even from the 1950's when that sort of aluminum trim was in fashion. In any case, they seem to have originally been designed to fit in a large opening on the side of the open porch and to provide shade as needed to that portion of the porch. See plaintiff's Exhibits 13 and 14.

86. Ms. Glenn testified that the horizontal panel was just leaning on the vertical pieces when they moved in and was completely blown off during a severe windstorm earlier this year. We find her testimony credible and consistent with the photographic evidence. As previously indicated, we find plaintiff's evidence is not credible on this point, the contention about the louvers serving a safety function is a self-serving exaggeration, and there is no material breach of the lease by defendants related to the louvers.

## LIGHT FIXTURES ON FRONT PORCH

87. Defendants contend that these three fixtures do not work and that plaintiff's repair person tried, unsuccessfully, to discover why they did not work, and that plaintiff then did nothing more. Plaintiff's only evidence on this subject was to point out that defendants' Exhibit L, a photo of the front steps, also showed that there were three fixtures in place. This was not sufficient to contradict defendants' testimony that the fixtures did not work. We find that the front porch lights do not work and further find that plaintiff's inability to determine why they do not work or how they are supposedly connected raises a safety concern that should be addressed or ruled out.

## TRASH VS. CLOTHING FOR DONATION/DEBRIS LEFT BY PLAINTIFF

88. Plaintiff contends that defendants violated one of the rules and regulations by having a bag of trash and a cardboard box on a porch, next to a wastebasket/ garbage can. See plaintiff's Exhibit 14, page 1, top photo.

Defendants say the bag and box contained clothing that Ms. Trotman was donating to her church and that Ms. Glenn's son had not yet taken there. Even if we assume it is garbage, and we do not find that it is, there is no evidence of where garbage generated by the household is to be put nor is there any evidence to suggest that this municipality, unlike most others, permits trash to be put out on the curb for collection every day as the lease's "Rules and Regulations" seem to require. We find no violation based on Exhibit 14.

89. The cushion shown in the yard in the bottom photo on page 1 of plaintiff's Exhibit 14 is not trash or debris, but is rather an abandoned object that plaintiff failed to remove and that Ms. Glenn's children play with on occasion.

90. The chair shown in plaintiff's Exhibit 14 in the top photo is property left by the prior tenant that plaintiff failed to remove, as promised.

91. We find there is no material breach of the lease by defendants based on trash or debris.

## PORCH LATTICE PANEL/DEBRIS UNDER PORCH/BRICKS BY HOUSE

92. The porch lattice panel was not removed or damaged by defendants. It was down when defendants began their tenancy and has not been repaired by plaintiff.

93. The debris under the porch was left by some other tenant or party and should have been removed by plaintiff, as promised.

94. The bricks by the side of the house were left by some other tenant or party and should have been removed by plaintiff, as promised.

95. There is no material breach of the lease by defendants related to the lattice or the bricks.

### DIRTY DISHES IN KITCHEN

96. Plaintiff contends that the few items left beside the stove and the sink on September 17, 2010 (when Mr. Kerrigan came to look at broken steps and ended up taking pictures) demonstrate a material breach of the lease. We reject that contention – the kitchen appears otherwise neat and fairly clean, and the dishes look like they were recently used, not like they were sitting there overnight or longer, as plaintiff suggests.

97. There is no material breach of the lease by defendants based on the condition of the kitchen.

### DAMAGED FLOOR TILES IN KITCHEN

98. Plaintiff contends that a maximum of four stick-on tiles would be needed to replace tiles that it claims defendants caused to come loose. We find that the tiles became unstuck because they were placed on a dirty or wet surface prior to defendants' tenancy. The fault is plaintiff's, not defendants'. However, we do not find that this minor damage constitutes a material breach, regardless of who was at fault.

### DAMAGE TO CELLAR DOOR AND STEPS

99. Defendants have admitted they caused some damage to the top step, by the cellar door, when they

dragged up the lawnmower. The damage is shown in plaintiff's Exhibit 20, page 4, bottom photo. It is slight given the overall condition of the "undamaged" portion of the floor and would not constitute a material breach of the lease.

100. Defendants deny causing any damage to the door itself, and we find their denial credible given what the evidence shows regarding the general condition of the house prior to defendants' occupancy, even taken in the light most favorable to plaintiff. In the absence of "before" pictures of the door at issue and doors throughout the house and any other evidence, we cannot make a finding one way or the other. Plaintiff has not met its burden on this point, so we find that defendants did not damage the kitchen door.

## ATTORNEYS FEES AND EXPENSES OF SUIT

101. The clause dealing with attorneys fees is one-sided, giving only the landlord the right to such an award. It is also open-ended, permitting the award of unspecified "other expenses."

102. There are no guidelines or boundaries by which defendants, or any other tenant, could foresee the possible amount due for attorneys fees if there were a dispute in the future.

103. Plaintiff's agent, Ms. Wise, did not point out or explain the attorneys fees clause to the defendants and there was no bargaining on that issue.

104. It would be unconscionable in the circumstances

to enforce that clause even if there had been adequate consideration for the written lease.

## OBLIGATIONS OF EACH PARTY UNDER THE WRITTEN LEASE

105. The exceptionally detailed obligations upon the defendants result in the landlord being able to terminate the lease for trivial reasons, if the landlord decides, as here, that the tenant is too demanding regarding the landlord's unfulfilled promises.

106. The micromanaging of a tenant's daily life is not something that one would ordinarily expect in a lease, and these terms should have been pointed out to defendants in November before plaintiff took $1,500 from them to secure their tenancy of the original house that had been promised.

107. Had those terms been pointed out on January 6, 2010, it would also have been too late in the circumstances, as defendants had already moved in by then.

## ENFORCEABLE TERMS OF THE ORAL AGREEMENTS BETWEEN THE PARTIES

108. The only terms that were orally agreed to or which flow naturally from the oral agreements regarding the subject premises are as follows:

a) Plaintiff was to give defendants possession of the subject premises as of January 1, 2010.

b) Defendants were to pay a monthly rent of $750, at a

reasonable time near the beginning of the month.

c) A reasonable date for the rent to still be timely would be by the 5th of each month.

d) Time would not be "of the essence" for any provision of the lease.

e) The lease would expire after one year, i.e. by December 31, 2010, unless the parties agreed to renew it.

f) The house would be in a habitable condition and would be clean and safe.

g) Promises regarding cosmetic issues would be fulfilled, in this case the promises involved removing the prior tenant's abandoned possessions, meeting the Borough's occupancy code requirements, replacing the carpeting in one room that had been damaged by spilled paint, the defendants' right to paint certain walls with neutral colors, or, if other colors were used, the original antique white color or something similar would be used by defendants to cover such non-neutral colors.

h) Any walls that were not newly painted by plaintiff would not have to be painted by defendants at the expiration of the lease if they did not change the paint on those walls.

i) Defendants would keep the house reasonably clean and would not disable any safety protections.

j) Plaintiff would promptly repair any problem that affected health or safety, such as hot water, furnace/boiler issues, electrical problems, plumbing leaks, and broken stairs.

k) Any cosmetic problems would be negotiated as they arose during the tenancy (for example, the kitchen floor tiles that came unstuck).

## DISCUSSION

The credible evidence shows that plaintiff had put defendants in an exceptionally difficult position with regard to relative bargaining power when it took defendants' money in November and then failed to have the house that had been promised in November ready by December 15, as promised. As a result, defendants orally agreed to rent a substitute house for a certain amount of rent per month. The written lease is really no more than an attempt to vary the terms of the oral agreement the parties had reached no later than January 3, 2010, the day defendants took possession of the subject premises. We conclude that there was no additional consideration provided by plaintiff in return for defendants' having executed the writing.

Even if we consider the written lease to be the final agreement between the parties, it is unconscionable and unenforceable.

The written lease at issue here is a form lease and is apparently known as the "Kostelac" lease. The last time Pennsylvania dealt with a form lease of this type, flush with oppressive terms and one-sided obligations, was

in 1974 in the case of *Commonwealth v. Monumental Properties, Inc. et al.*, 459 Pa. 450, 329 A.2d 812 (1974). The lease at issue there was a form lease used in the Philadelphia area. The Pennsylvania Attorney General brought an action against Monumental Properties and others, all residential landlord, for various violations of the Consumer Protection Law (CPL). A lower court dismissed the entire case on the defendant's preliminary objections. An appeal was heard by the Commonwealth Court and then by the Pennsylvania Supreme Court. The Supreme Court held that residential leases and landlords were subject to the CPL under what had been pled as to the count based on deceptive practices and also held that sanctions under the CPL could properly be imposed on those defendants under the facts pled.

The Supreme Court's analysis is well worth re-reading, although we will not repeat it here. The important point for us is found in the dicta that the Supreme Court included when if overruled the landlords' preliminary objections.

Because we have found the "Kostelac" form lease here unenforceable because it was without adequate consideration, we will not discuss at this time the extraordinary extent to which it violates the precepts set forth in *Monumental Properties*. We place the court costs on plaintiff, who we regard as the losing party despite our decision to award them the rents that were paid into court.

Pursuant to the rules of court cited above, this decision constitutes the verdict of this court; there will be no separate verdict slip filed.